**J. A. ZACHARIASSEN & CO., Edgar Erickson, Henrick Waldemar Widberg, Rederiaktiebolaget Aura, Helge Hedman and Carl Nygren, as Executors in Bankruptcy of the Estate of Rederiaktiebolaget Finlandicia, Aktiebolaget Finska Skolskeppsrederiet, Edgar Erikson, Stig Lundqvist, Olaf Blom, Stig Lundqvist, Henrick Waldemar Widberg, and Stig Lundqvist**

**v.**

**The UNITED STATES.**

No. 1–52.

United States Court of Claims.

June 5, 1956.

---

John Wattawa, Washington, D. C., for plaintiffs.

J. Frank Staley, Washington, D. C., Warren E. Burger, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

LITTLETON, Judge.

This is a congressional reference case. On February 25, 1952, the United States Senate, 82d Cong., 1st Sess., adopted Senate Resolution 34,[1] and transmitted a copy thereof, together with a copy of Senate bill 334[2] to this court for action pursuant to sections 1492[3] and 2509[4] of Title 28 United States Code.

Senate bill 334 provided for compensation to the owners of 13 Finnish sailing vessels or to their respective successors, assigns, or heirs, for damages or compensation arising out of the detention of the 13 Finnish vessels in United States ports at Boston and New York between March 18 and November 26, 1918.

---

[1.] Quoted in finding 1 of the Findings of Fact.

[2.] Quoted in finding 2 of the Findings of Fact.

[3.] Section 1492 of title 28 reads as follows: "The Court of Claims shall have jurisdiction to report to either House of Congress on any bill referred to the court by such House, except a bill for a pension, and to render judgment if the claim against the United States represented by the referred bill is one over which the court has jurisdiction under other Acts of Congress."

[4.] Section 2509 of title 28 reads as follows: "Whenever any bill, except for a pension, is referred to the Court of Claims by either House of Congress, such court shall proceed with the same in accordance with its rules and report to such House, the facts in the case, including facts relating to delay or laches, facts bearing upon the question whether the bar of any statute of limitation should be removed, or facts claimed to excuse the claimant for not having resorted to any established legal remedy.

"The court shall also report conclusions sufficient to inform Congress whether the demand is a legal or equitable claim or a gratuity, and the amount, if any, legally or equitably due from the United States to the claimant."

Although separate petitions have been filed on behalf of the respective plaintiffs under the congressional reference, all the claims will be disposed of in this opinion since all the cases involve the same issue, the petitions are identical in substance, and all the claims involve the same or substantially the same facts and circumstances.

The chronology is that the incidents upon which these claims are asserted occurred in 1918, prior to the armistice. On or about June 20, 1923, the several owners of these sailing vessels involved, through J. H. Whitney and Company, their agent in the United States (previously handling for them the related transactions and proofs), filed with the Shipping Board claims against the United States upon the theory that the Government had chartered each of the vessels and had failed to carry out the charter arrangement, resulting in losses, which claims were denied April 22, 1924. No claims then for illegal detention through failure to issue bunker licenses or otherwise were asserted. Congress, by Act approved June 29, 1936, 49 Stat. 2368,[5] conferred jurisdiction upon the Court of Claims to hear, examine and adjudicate the claims of the owners of these vessels against the United States, and authorized the Court of Claims to hear the facts and answer certain specific questions submitted but permitted the court to receive additional evidence other than the referred documents as the court deemed material. Petitions by owners were filed July 20, 1936, and the court entered an order granting the parties authority to take additional unlimited proofs. Under authority thereof, oral testimony of witnesses covering 657 pages of testimony were received and 65 exhibits by the plaintiffs and 24 exhibits by the Government were introduced, all of which were considered by the court in its findings of fact and opinion, on June 2, 1941, in the Zachariassen case, 94 Ct.Cl. 315 (adopted as a test case), with certiorari denied by the Su-preme Court, 315 U.S. 815, 62 S.Ct. 804, 86 L.Ed. 1213. Subsequently this court filed its separate per curiam opinion on April 6, 1942, Erikson v. United States, 96 Ct.Cl. 127, in the remaining cases, Nos. 43373–43383, inclusive, adopting the controlling facts as to liability in its previous Zachariassen opinion and dismissing the claims.

The questions which the court must now determine in these cases are whether the respective plaintiffs who have presented their petitions have either legal or equitable claims against the United States, and the amount of damages, if any, which the plaintiffs are legally or equitably entitled to recover.

We have carefully considered the record and it is our opinion that none of the plaintiffs have either a legal or an equitable claim against the United States and that, therefore, no amount is legally or equitably due them from the United States.

Since the facts from which these claims arose are set forth fully in the court's findings of fact, a brief summary will suffice here. All the vessels mentioned in Senate Bill 334 arrived in ports in the United States during the year 1918, when the United States was at war with the German and Austro-Hungarian governments. Although Finland had declared her independence from Russia in 1917, all the vessels were sailing under the Russian flag when they arrived in this country. The United States, acting through its War Trade Board and the Shipping Board, detained them for varying periods of time between March 18 and November 26, 1918, by refusing to grant bunker licenses for ship's stores and, in some instances, export cargo licenses, without which the ships could not sail. We previously held and here hold that the defendant was acting properly and within its legal rights. The action of the War Trade Board in refusing to grant these licenses was due to (a) the probability of the vessels proceeding through the war dan-

5. The act is quoted in finding 3 of the court's Findings of Fact.

ger zone, and the possible seizure of the vessels and their cargoes and stores by the enemy, (b) the uncertainty of the political situation in Russia and Finland, and (c) the character and responsibility of the officers and crews of the vessels. After the vessels had been delayed for varying periods of time, as shown in the tabulation hereinafter set forth, it was determined that the suspicions concerning the officers and crews were unfounded, and the vessels were finally granted the necessary licenses and permitted to sail. The investigation of the loyalty, character and responsibility of the officers and crews was a delicate matter and was postponed until all other phases of the matter of sailing were disposed of.

The legal questions involved in these claims were originally considered by this court pursuant to the above-mentioned Act of Congress approved June 29, 1936, 49 Stat. 2368, which conferred jurisdiction upon the court. The parties were allowed, as hereinbefore stated, to submit unlimited proof and the legal rights of the plaintiffs were fully and carefully considered and adjudicated.

The first claim to be considered concerned the detention of the vessel Albyn and was decided in J. A. Zachariassen & Co. v. United States, 94 Ct.Cl. 315, certiorari denied 315 U.S. 815, 62 S.Ct. 804, 86 L.Ed. 1213, in which case on the findings and opinion it was held that the detention was not unlawful and that the plaintiff in that case was not legally entitled to recover. The remaining claims were dismissed in a *per curiam* opinion reported at 96 Ct.Cl. 127, upon the authority of the findings of fact and opinion in the Zachariassen case. For reasons stated in the original Zachariassen opinion, which is transmitted to the Senate with this opinion, it is our view that none of the plaintiffs have legal claims against the United States.

■■ No new evidence on the merits has been presented and the question of defendant's legal liability is *res adjudicata* by reason of the Zachariassen case

and the related decision, 96 Ct.Cl. 127, dealing with the other claims. However, in a Congressional reference such as this, the court will further consider the equitable side of the claims even though the legal questions have been disposed of previously. Burkhardt v. United States, 82 F.Supp. 333, 113 Ct.Cl. 115 and 84 F.Supp. 553, 113 Ct.Cl. 658.

The commissioner of the court in the present proceedings has found that no additional material evidence on the question of liability, either legal or equitable, has been offered by the parties although they have been given full opportunity to do so. After scrutinizing the record we are in agreement with the commissioner's conclusion. Therefore, we have again examined the evidence offered in the earlier proceedings to determine whether the plaintiffs have equitable claims against the defendant of such character as would entitle them to payment of compensation by Congress other than as a gratuity.

In support of their position that they have equitable claims, (they apparently use "equity" in its broadest sense), the plaintiffs contend that the detention of the vessels was due to unfounded suspicions of the officers and crews and that the vessels were actually detained for the purpose of compelling the owners to charter them to the United States.

■ While it is true that the suspicions concerning the crews ultimately proved unfounded, it appears that there were reasonable grounds for such suspicions during the period when the vessels were detained. That suspicion had been suggested by the agent of plaintiffs. This country was at war with Germany and her allies. The political situation in Russia at that time was very unstable. Finland had been a part of Russia for many years prior to 1917. It declared its independence from Russia in 1917, but neither the Russian nor Finnish governments had been recognized by the United States at the time the ships were detained. Furthermore, all the vessels were sailing under the Russian flag when

they arrived in United States ports. In view of the unsettled political situation, we feel that it was not only reasonable but prudent as well for the United States officials to question the reliability and the political affiliations of the crews since it would have been very detrimental to the United States if the vessels and their cargoes and stores had fallen into the hands of her enemies. Since reasonable grounds for the suspicions existed at the time the vessels were detained, we do not feel that plaintiffs are equitably entitled to recover merely because such suspicions ultimately proved unfounded. The matter of chartering the vessels was primarily for their safety on the voyages and when those negotiations terminated the crews were promptly investigated.

It is also our opinion that there is no merit in plaintiffs' allegation that the vessels were actually detained for the purpose of *compelling* the owners to charter them to the United States. The evidence does not support this contention. In the special findings of the court in the original Zachariassen case the facts and circumstances which formed the basis for withholding the bunker licenses were stated to be (a) the possibility of the seizure of the vessels by the enemy and the appropriation of their cargoes and stores, (b) the uncertainty of the political situation in Russia and Finland and, (c) the character and responsibility of the officers and crews. No new evidence has been presented which would cause the court to reach a different conclusion as to the reasons for the withholding of the licenses which would have enabled the vessels to sail.

Plaintiffs further urge that they are equitably entitled to recover because of the delay in the investigation of the officers and crews of the vessels. It appears that approximately three months elapsed between the time the matter first came to the attention of the War Trade Board and the time the investigation was conducted and concluded by Naval Intelligence. While such delays are unfortunate, we believe, in the circumstances of these cases, that they are inevitable in time of war, and we cannot accept the view of plaintiffs that the United States is equitably and morally obligated to compensate them for losses caused by such delays unless the delays are clearly unreasonable or without cause. The present case does not, in our opinion, fall within the exception of unreasonableness. A situation which was potentially dangerous to the United States had arisen and the question of how to protect the interests of the Nation as to cargoes and supplies was being carefully considered by various Government agencies. When it was finally decided that an investigation of the loyalty, character and responsibility of the crews should be conducted, it was promptly instituted and concluded. It is our opinion that the mere fact that it was not immediately determined that an investigation of the crews was the proper course of action, does not make the delay unreasonable or without cause. Furthermore, the plaintiffs have failed to establish that they were treated differently than others who suffered delays because of wartime conditions.

We have carefully considered plaintiffs' other contentions regarding equitable relief and have found them to be without substance. We are, therefore, of the opinion from the record, that in view of all the facts and circumstances, the plaintiffs have no basis for equitable claims against the United States.

## Conclusion

It is the conclusion of the court that the plaintiffs have no legal or equitable claims against the United States for reasons set out in the findings and the opinion of the court in these cases as well as in the Zachariassen case, supra. We further conclude that no amount is legally or equitably due from the United States to the claimants and that any amount or amounts that might be awarded by Congress, in its discretion, to any of the claimants, will be in the nature of a gratuity.

In view of our conclusion concerning legal and equitable liability, the question of compensation or damages has not been discussed in the opinion herein. However, when these same claims were originally before the court and considered under the Act of Congress of June 29, 1936, former Commissioner C. W. Ramseyer of this court made findings and considered the matter of damages in each case, and filed a report with the court in each case, on December 13, 1939. For convenience, the following table sets forth the name of the present case and its number, the name of the corresponding prior case and its number, and the name of the vessel or vessels involved in each:

| Name of present case and No. | Name of corresponding prior case and No. | Name of vessel involved |
|---|---|---|
| CONG. 1-52 | | |
| J. A. Zachariassen & Co. | 43372, J. A. Zachariassen & Co. | *Albyn.* |
| Edgar Erikson | 43373, Gustaf Erikson | *Professor Koch.* |
| Henrik Waldemar Widberg. | 43374, Henrik Waldemar Widberg. | *Kensington.* |
| Rederiaktiebolaget Aura | 43375, Rederiaktiebolaget Aura, a corporation. | *Fahrwohl, Pampa.* |
| Helge Hedman and Carl Nygren, as executors in bankruptcy of the estate of Rederiaktiebolaget Finlandicia. | 43376, Helge Hedman and Carl Nygren, as executors in bankruptcy of the estate of Rederi Aktiebolaget Finlandicia, a corporation | *Rowena.* |
| Aktiebolaget Finska Skolskeppsrederiet. | 43377, Aktiebolaget Finska Skolskeppsrederiet. | *Glenard.* |
| Edgar Erikson | 43378, Gustaf Erikson | *Grace Harwar.* |
| Stig Lundqvist | 43379, Hugo Lundqvist | *Prompt.* |
| Olaf Blom | 43380, Arthur E. Blom. | *Woodburn.* |
| Stig Lundqvist | 43381, Arthur Lundqvist | *Parchim.* |
| Henrik Waldemar Widberg. | 43382, Juho Saarinen | *Port Patrick.* |
| Stig Lundqvist | 43383, Oskar J. Engman | *Vidylia.* |

All reports of former Commissioner Ramseyer, with the exception of the original copy in the United States Archives, have been destroyed. In order to save the heavy cost of printing, those reports are not reproduced herein. It is presumed that plaintiffs' counsel has copies. However, since, as we have hereinbefore stated, all the basic essential facts as to the detention of the several vessels were the same, except as to tonnage, prepaid freight, period of delay, wages and maintenance of the crews during the delay periods, we set forth below a tabulation containing 10 columns, the first 8 of which contain the findings of Commissioner Ramseyer as to the ships and the compensation or damage on the basis, used by him, of 25 cents a "net registered ton" and wages and expenses of crews for the detention periods shown for each vessel.

In the test case of the ship Albyn, J. A. Zachariassen & Co., 94 Ct.Cl. 315, the court did not adopt the commissioner's "net-registered-ton" theory of damages, but the court used instead the "net-freight-plus-expenses" basis in arriving at the compensation payable in the event it should be held by the Supreme Court that there was legal or equitable liability for the detention by the United States.

In column 9 we have shown the difference between the amount recommended by the court's commissioner on the "net-registered-ton" basis and that determined by the court on the "net-freight" basis. By applying the same percentage (98.134%) to the other vessels the amounts shown in column 9 are arrived at. The total difference, on such percentage basis, between the total amount reported by Commissioner Ramseyer and the amount allowed by the court is $9,327.05.

Column 10 shows the amounts claimed by plaintiffs as set forth in Senate Bill 334, which bill was referred to this court for report by Senate Resolution 34, 82d Cong. 1st Sess.

| (1) Vessel | (2) Tonnage | (3) Freight prepaid | (4) Days detained | (5) Value of use—25 cents per N. R. T.[1] | (6) Wages of crew | (7) Maintenance of crew | (8) Total of last 3 items | (9) Percentage *Albyn* net-freight formula | (10) Amount claimed in S. 334 |
|---|---|---|---|---|---|---|---|---|---|
| Albyn | 1,993 | $98,897.13 | 114 | $56,800.50 | $4,361.62 | $1,140 | $62,302.12 | $61,139.62 | $75,829.71 |
| Prof. Koch | 1,357 | 68,724.83 | 104 | 35,282.00 | 3,916.64 | 1,040 | 40,238.64 | 39,487.83 | 47,268.40 |
| Kensington | 1,625 | 86,400.00 | 87 | 35,343.75 | 3,334.71 | 870 | 39,548.46 | 38,810.53 | 46,109.35 |
| Fahrwohl | 1,384 | 68,250.00 | 77 | 26,642.00 | 2,768.69 | 770 | 30,180.69 | 29,617.55 | 33,976.37 |
| Pampa | 1,676 | 77,781.57 | 98 | 41,062.00 | 3,756.34 | 980 | 45,798.34 | 44,943.79 | 71,056.75 |
| Rowena | 1,891 | 93,493.18 | 106 | 50,111.50 | 3,991.96 | 1,060 | 55,163.46 | 54,134.16 | 62,663.53 |
| Glenard | 1,728 | 94,241.28 | 119 | 51,408.00 | 5,195.54 | 1,190 | 57,793.54 | 56,715.17 | 73,639.74 |
| Grace Harwar | 1,782 | 87,580.79 | 60 | 26,730.00 | 1,600.00 | 300 | 28,630.00 | 28,095.79 | 88,532.64 |
| Prompt | 1,354 | 61,718.85 | 79 | 26,741.50 | 3,054.64 | 790 | 30,586.14 | 30,015.43 | 60,162.75 |
| Woodburn | 1,445 | 76,500.00 | 45 | 16,256.25 | 1,695.00 | 450 | 18,401.25 | 18,057.90 | 44,063.64 |
| Parchim | 1,716 | 85,459.90 | 92 | 39,468.00 | 3,464.72 | 920 | 43,852.72 | 43,034.47 | 71,952.15 |
| Port Patrick | 1,595 | 83,896.01 | 92 | 36,685.00 | 3,464.72 | 920 | 41,069.72 | 40,303.40 | 55,172.23 |
| Vidyha | 664 | 32,200.00 | 31 | 5,146.00 | 909.23 | 248 | 6,303.23 | 6,185.62 | 14,829.78 |

[1] Net registered ton.

The findings of fact and opinion herein, together with the findings and opinion in the original test case of J. A. Zachariassen & Co. v. United States, 94 Ct.Cl. 315, will be certified to the United States Senate pursuant to Senate Resolution 34, supra.

It is so ordered.

JONES, Chief Judge, and LARAMORE, MADDEN, and WHITAKER, Judges, concur.

Findings of Fact

The court, having considered the evidence, the briefs and argument of counsel, and the report of Commissioner Marion T. Bennett, makes the following findings of fact:[6]

1. The United States Senate, 82d Congress, First Session, on February 25, 1952, adopted Senate Resolution 34 as follows:

"*Resolved,* That the bill (S. 334) entitled 'A bill for the relief of the owners of certain Finnish sailing vessels' now pending in the Senate, together with all the accompanying papers, is hereby referred to the Court of Claims; and the court shall proceed with the same in accordance with the provisions of sections 1492 and 2509 of title 28 of the United States Code and report to the Senate, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand as claims, legal or equitable, against the United States and the amounts, if any, legally or equitably due from the United States to the claimants."

2. Senate Bill 334, referred to in the resolution above, reads as follows:

"*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the Secretary of the Treasury is authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, to the owners of the following named Finnish sailing vessels, or to their respective successors, assigns, or heirs, the sums hereinafter indicated, together with interest on such sums at the rate of 4½ per centum per annum from November 26, 1918, to date of payment, in full satisfaction of their claims for damages, or loss of earnings, arising out of the detention of such vessels in United States ports for varying periods of time between March 18 and November 26, 1918: Albyn, $75,-829.71; Grace Harwar, $88,532.64; Prompt, $60,162.75; Prof. Koch, $47,268.40; Kensington, $46,169.35; Fahrwohl, $33,976.37; Glenard, $73,639.74; Pampa, $71,056.75; Rowena, $62,663.53; Parchim, $71,-952.15; Woodburn, $44,063.64; Port Pattrick, $55,172.23; Vidylia, $14,829.78: *Provided,* That no part of the amounts appropriated in this Act in excess of 10 per centum thereof shall be paid or delivered to or received by any agent or attorney on account of services rendered in connection with any such claims, and the same shall be unlawful, any contract to the contrary notwithstanding. Any person violating the provisions of this Act shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined in any sum not exceeding $1,-000.

"Sec. 2. The payments authorized to be made by the first section of this Act shall be made to the Minister of Finland to the United States, then resident in the United

6. Since no new material evidence relating to the question of liability, either legal or equitable, has been offered by the parties in the present proceedings, the court has adopted, except for minor changes, findings 1, 2, 7, 8, 11, 12, 13, 14, 15 and 16 from the special findings of fact made in the earlier Zachariassen case, 94 Ct.Cl. 315. These findings are numbered 3 through 12 in the court's findings in the present proceedings.

States, for distribution by him to the owners of such vessels, or to their respective successors, assigns, or heirs, in accordance with the laws of the Republic of Finland, after payment of compensation allowed to counsel for services rendered in connection with any of such claims."

3. The legal questions involved in these claims were previously considered by this court pursuant to an Act of Congress approved June 29, 1936, 49 Stat. 2368, which provided as follows:

"That jurisdiction be, and is hereby, conferred upon the Court of Claims, notwithstanding any lapse of time or any statutes of limitations, to hear, examine, and adjudicate claims against the United States on the part of owners of certain Finnish sailing vessels, to wit: Glenard, Kensington, Vidylia, Parchim, Woodburn, Port Patrick, Grace, Harwar, Professor Koch, Prompt, Albyn, Rowena, Fahrwohl, and Pampa, for damages said to have been sustained as a result of the alleged refusal of representatives of the United States to permit said vessels to sail from United States ports during the period between March 18, 1918, and November 26, 1918: *Provided,* That such suit or suits shall be brought within three months after the date of the approval of this Act.

"Sec. 2. In determining the said claims, the Court of Claims shall pass solely on the following questions:

"1. Were the thirteen Finnish sailing vessels named herein, or any one or more of them, detained by the United States?

"2. If the preceding question is answered in the affirmative, was such detention unlawful?

"3. If the second question is answered in the affirmative, is the United States obligated to indemnify the owner or owners, or their successors in interest, of the vessel or vessels found to have been unlawfully detained?

"4. If the third question is answered in the affirmative, what indemnity should be paid by the United States with respect to each vessel found to have been unlawfully detained?

"Sec. 3. The claims shall be prosecuted in the name of the owner or owners or managing owner or owners of the said several ships. If the Court of Claims, or the Supreme Court on appeal, decides that the United States is obligated to indemnify the owner or owners, or their successors in interest, the amount of the indemnity shall be paid by the United States to the Envoy Extraordinary and Minister Plenipotentiary of the Republic of Finland then resident in the United States, for the use and benefit of the owner, owners, or their successors.

"Sec. 4. In determining the aforesaid claims, the Court of Claims shall receive and consider the evidence and arguments contained in (a) the record mentioned in the note of the Minister of Finland to the Secretary of State, dated February 1, 1935; (b) the answer mentioned in the note of the Secretary of State to the Minister of Finland, dated March 4, 1935; and (c) the reply and additional material mentioned in the note of the Minister of Finland to the Secretary of State, dated April 12, 1935, relating to said claims.

"Neither party shall be entitled as of right to present as evidence documents other than those specified herein, except copies of other correspondence pertinent to the case exchanged between the Department of State and the Legation of Finland: *Provided,* That the court shall be authorized to require the production of such additional evidence as the court deems material."

The parties were permitted to submit unlimited proof pursuant to an order of the court. The first claim considered concerned the detention of the vessel Albyn and was decided in J. A. Zachariassen & Co. v. United States, 94 Ct.Cl. 315, certiorari denied 315 U.S. 815, 62 S.Ct. 804, 86 L.Ed. 1213, where it was held that although the vessels were detained, the detention was not unlawful and the plaintiff was not legally entitled to recover. The remaining claims were dismissed upon the authority of the Zachariassen case in a *per curiam* opinion reported in 96 Ct.Cl. 127.

4. From April 6, 1917, until after the expiration of the period during which the sailing vessels named in Senate bill 334 were detained, the United States was at war with the Imperial German Government and the Imperial and Royal Austro-Hungarian Government. Prior to February 1917, the then existing Czarist Government had been overthrown and, in the latter part of 1917, the new government was overthrown and the Soviet Government was formed. On December 6, 1917, Finland, which prior to that time had been a Grand Duchy of Russia, declared her independence of the Soviet Russian Government. Both before and after Finland declared her independence of Russia, the sailing vessels referred to in Senate bill 334 were of Finnish registry. Before Finland's declaration of independence and at the times these vessels arrived in the ports of the United States, they sailed under the Russian flag. After their arrival here the American agents at the request of the masters cabled abroad for the markings of the new Finnish flag, and, thereupon, Finnish flags were made and raised on the vessels. The independence of Finland, or its status as a *de facto* government, was not recognized by the United States until May 7, 1919. At the time Finland proclaimed its independence in December 1917, the Soviet Government then and during the periods herein concerned had not been recognized by the Government of the United States.

5. After declaration of war by the United States an Act of Congress known as the Espionage Act was approved June 15, 1917. In Title 7 of this act certain exports in time of war were made unlawful, except upon certain conditions. Section 1 of this title provided that whenever the President should find that the public safety should so require, and should make proclamation thereof, "it shall be unlawful to export from or ship from or take out of the United States to any country named in such proclamation any article or articles mentioned in such proclamation, except at such time or times, and under such regulations and orders, and subject to such limitations and exceptions as the President shall prescribe, until otherwise ordered by the President or by Congress: * * *." Section 2 made it a criminal offense for any person to export, ship, or take out, or deliver or attempt to deliver for export, shipment, or taking out, any article in violation of Title VII, or of any regulation or order made thereunder. Section 3 provided that whenever there was reasonable cause to believe that any vessel, domestic or foreign, was about to carry out of the United States any article or articles in violation of the provisions of Title VII, the collector of customs for the district in which such vessel was located was authorized and empowered, subject to review by the Secretary of Commerce, to refuse clearance to any such vessel, domestic or foreign, for which clearance was required by law. Under this statute and by virtue of the power conferred upon him thereunder, the President, from time to time, issued several proclamations and orders prohibiting exports from the United States without license of the proper authority and providing for and setting up of an organization to carry out and enforce the provisions of the new laws and regulations made pursuant thereto.

The first proclamation of the President relative thereto was issued July 9, 1917, 40 Stat. 1683. It provided that "except at such time or times, and under such

regulations and orders, and subject to such limitations and exceptions as the President shall prescribe," certain categories of goods therein mentioned "shall not, on and after the fifteenth day of July 1917, be carried out of or exported from the United States or its territorial possessions" to foreign countries enumerated in the proclamation, including Russia, of which Finland was then a part. The proclamation listed, among other things, coal, coke, fuel oils, kerosene and gasoline, including bunkers; food grains, flour and meal therefrom, fodder and feeds, meat and fats. The proclamation added that the "orders and regulations from time to time prescribed will be administered by and under the authority of the Secretary of Commerce, from whom licenses, in conformity with the said orders and regulations, will issue."

By proclamation of August 27, 1917, 40 Stat. 1691, the list of articles subject to prohibition of export without license was considerably enlarged and made to include "all contrivances for or means of transportation on land or in the water or air." The proclamation also provided that on and after August 30, 1917, the goods enumerated therein should not "be exported from, shipped from or taken out of the United States or its territorial possessions" without authority duly obtained. It named the Export Administrative Board as the authority "from whom licenses * * * will issue." A third proclamation specifying a further and more complete list of articles was issued February 14, 1918, 40 Stat. 1746.

For the purpose of administering and executing the provisions of law, as well as the proclamations and orders, the President, by an order of June 22, 1917, created an Exports Council which was authorized and directed by him to formulate policies for the consideration and approval of the President and to make recommendations necessary to carry out the purposes of the Espionage Act of June 15, 1917.

By order of August 21, 1917, the President created another body known as the Exports Administrative Board which he entrusted with the execution of all provisions of Title VII of the Espionage Act and the proclamations issued thereunder, and this Board was authorized and directed, among other things, to grant or refuse export licenses thereunder in accordance with his instructions.

This order was later superseded by an order of October 12, 1917, establishing the War Trade Board which was given the power and authority to issue licenses under such terms and on such conditions as were not incompatible with law, or to grant or refuse licenses for the exportation of all articles (except coin, bullion, or currency), the exportation or taking out of the United States of which might be restricted by proclamations theretofore or thereafter issued under Title VII of the Espionage Act.

By the same order the President vested in the Secretary of Commerce the power "to review the refusal of any Collector of Customs under the provisions of sections 13 and 14 [Act of October 6, 1917] of the Trading with the Enemy Act [50 U.S.C.A.Appendix, §§ 13, 14] to clear any vessel, domestic or foreign, for which clearance is required by law."

The Executive Order establishing the War Trade Board and defining its powers and authority is in evidence as "U. S. Annex No. 23" and is in part as follows:

"I. I hereby establish a War Trade Board to be composed of representatives, respectively, of the Secretary of State, of the Secretary of the Treasury, of the Secretary of Agriculture, of the Secretary of Commerce, of the Food Administrator, and of the United States Shipping Board.

"II. I hereby vest in said Board the power and authority to issue licenses under such terms and conditions as are not inconsistent with law, or to withhold or refuse licenses, for the exportation of all articles, except coin, bullion, or currency, the exportation or taking of which out of the United States may be restricted by proclamations here-

tofore or hereafter issued by me under said Title VII of the Espionage Act.

\* \* \* \* \*

"VII. I hereby revoke the Executive order of August 21, 1917, creating the Exports Administrative Board. All proclamations, rules, regulations, and instructions made or given by me under Title VII of the Espionage Act and now being administered by the Exports Administrative Board are hereby continued, confirmed, and made applicable to the War Trade Board, and all employees of the Exports Administrative Board are hereby transferred to and constituted employees of the War Trade Board in the same capacities, and said War Trade Board is hereby authorized to exercise without interruption the powers heretofore exercised by the said Exports Administrative Board.

"VIII. The said War Trade Board is hereby authorized and empowered to take all such measures as may be necessary or expedient to administer the powers hereby conferred. And I hereby vest in the War Trade Board the power conferred upon the President by section 5(a) to make such rules and regulations, not inconsistent with law, as may be necessary and proper for the exercise of the powers conferred upon said board."

6. As early as August and September 1917, the United States Shipping Board, a member of which was a member of the War Trade Board, and the Navy Department expressed the necessity of preventing sailing vessels proceeding through the war or danger zone and the collectors of customs were advised as early as November 2, 1917, that every vessel, before being allowed to clear from an American port, must have a license for any bunkers, fuel, or ship's stores and supplies and that no license would be granted to any vessel, including sailing vessels, under a neutral flag without special instructions from the Bureau of

Transportation of the War Trade Board created and established under Executive Order of October 12, 1917, supra.

By proper notice given through the Journal of the War Trade Board, No. 5, dated and published January 1, 1918, notice of bunker regulations and rules were published—General Rule No. 1 providing as follows:

"No vessel shall be allowed to clear from any port of the United States or any United States possession, without having secured a license or licenses from the War Trade Board, through its Bureau of Transportation, covering all the bunker fuel aboard the vessel at the time of sailing (including coal, coke, oil, kerosene, and gasoline) and port, sea, and ship's stores and supplies. Stores and supplies are for convenience hereafter included with bunker fuel under the general designation of 'bunkers.' Before the loading of any 'bunkers' on any vessel at any port of the United States or its possessions shall be permitted, the license for 'bunkers' must be obtained. All applications for licenses for 'bunkers' must be made upon Application Form B–1, or such other form as may hereafter be adopted by this Board. Application for such licenses shall be approved only in accordance with the following and such other rules as may from time to time be adopted:

"I. No application for 'bunkers' by a sailing vessel for a voyage into the submarine war zone shall be approved. Sailing vessels equipped with auxiliary motive power shall, in the application of these rules, be classified as sailing vessels. A motor ship having no sailing power whatsoever shall be deemed to be in the same class as a steamship."

The War Trade Board defined the war zone boundary to "Include in general all areas within the radius of submarine activities, in particular all European and Mediterranean ports, and all Atlantic

Islands lying east of 59 degrees west longitude and north of 20 degrees north latitude." In a resolution of the War Trade Board of April 26, 1918, it was provided "That the War Trade Board hereby adopt for all purposes connected with the exercise of its functions the description and definition of the submarine danger zone now used by the Navy Department." The interpretation placed upon this resolution is shown by a memorandum of the War Trade Board in the official files of that Board dated May 10, 1918, as follows:

"Sailing vessels shall not be allowed to proceed into the area which is enclosed by a line joining the following positions: Running South along 37 degrees West longitude to 37 degrees North latitude; thence Southeast to 10 degrees North latitude, 29 degrees 30 minutes West longitude; thence Southeast to Cape Palmas, West Coast of Africa (4 degrees 22 minutes North latitude, 7 degrees 44 minutes West longitude)."

All the vessels mentioned in Senate bill 334 arrived in ports in the United States in 1918, when the United States was at war, and were temporarily denied bunker licenses without which they could not depart. The reasons for the detention will appear in subsequent findings.

The log books of all the vessels named in Senate bill 334 were ordered produced by the court when suits were being brought pursuant to the special jurisdictional act of 1936, supra, but only the log books for the sailing vessels Prompt, Rowena, and Vidylia were produced, from which it appears that their actual sailing routes, as reported by each of the vessel's logs, took them within the limits of the restricted areas defined as hereinabove set forth.

During the period March 23 to July 31, 1918, the War Trade Board granted export cargo licenses and "bunker" licenses to a number of vessels classed as sailing vessels under War Trade Board Regulations, but in those cases there were conditions, circumstances, and con-siderations with respect to the safety of the vessels, cargo, stores and supplies not present in the case of the Finnish sailing vessels named in Senate bill 334, upon the basis of which the War Trade Board decided to grant licenses upon which clearances were obtained.

7. In communications, claims, and conferences between various representatives of the United States and the American agent of the owners of the Finnish sailing vessels during the period here involved, the vessels were referred to interchangeably as Russian, Russian-Finnish, and Finnish.

April 20, 1918, the War Trade Board, by appropriate Minute, took the following action:

"(8) Mr. Munson [a member of the Shipping Board and that Board's representative on the War Trade Board] stated to the Board that it was desirable that the Bureau of Transportation be authorized by the Board to refuse licenses for bunkers for vessels, the owners, masters, or officers whereof are suspected of enemy affiliations or activities. Thereupon, on motion duly made and seconded, the following resolution was adopted:

"Resolved, That the Bureau of Transportation be, and it hereby is, authorized to refuse licenses for bunkers for vessels whereof the owners, masters, or officers are reported by the Bureau of War Trade Intelligence to be suspected of enemy affilations or of being engaged in enemy activities."

Early in April 1918 the War Trade Board and the Shipping Board, the interests of which in matters of shipping were interrelated, were somewhat concerned, in the circumstances, with reference to the attitude, character, and responsibility of the crews of these sailing vessels. These two boards, by reason of their duties and responsibilities, worked in close cooperation with reference to ships and shipping matters, as well as did other departments of the Govern-

ment, and particularly those departments and agencies which were under the statute and the Executive orders being represented by the War Trade Board, the membership of which was composed of representatives of the responsible departments and agencies.

On April 3, 1918, after application for bunker licenses had been made to the War Trade Board for certain of the Finnish vessels named in Senate bill 334, the War Trade Board wrote the Director of Operations of the Shipping Board as follows:

"These five Russian Barks ['Albyn', 'Professor Koch', 'Rowena', 'Prompt', and 'Kensington'] are being held, and we are awaiting reply from the Shipping Board as to their wishes regarding same, it being my opinion that this is a very serious matter, and I am strongly in favor of these Russian boats being taken under control of the Shipping Board or one of our Allies before being allowed to proceed. The present personnel of the crews would undoubtedly make them a very undesirable risk no matter what guarantees were given."

Pursuant to this letter from the War Trade Board, the Shipping Board, on the same day, gave written instructions to one of its employees to look into the matter of the present obligations of the Russian or Finnish sailing vessels then in ports of the United States, as follows:

"You will note that some of them are carrying oil and it is our feeling that these vessels should be prevented from continuing their voyages with Russian crews. Mr. Polk [counsellor] of the State Department has expressed this view. Will you kindly look over this situation and advise what your recommendations would be? In the meantime the ships will be held."

As a result, the representative of the Shipping Board conferred with the New York agent of the sailing vessels and, in their conversation, the Shipping Board's representative suggested that for the safety of the ships and cargoes, the Shipping Board might charter them on a bare-boat basis. The agent of the vessels at that time expressed some doubt as to the responsibility of the crews of the vessels. From that time until about June 10, the matter of terms and conditions upon which the owners might be willing to charter the vessels to the United States were considered back and forth but satisfactory terms were not agreed on, and on June 10, 1918, the Shipping Board advised the New York agent of the owners of these vessels that it was no longer interested in the matter.

8. On April 9, 1918, the matter of licenses for ship's stores for certain of the Finnish sailing vessels was considered by the War Trade Board and the Minutes of the Board of that date show the following:

"(9) Mr. White [a member of the War Trade Board] referred to several Russian sailing vessels which proposed to clear from Atlantic ports with cargoes of oil for Australia and South Africa, and he suggested the possible inadvisability of permitting these vessels to sail, in view of the character of their cargoes. After a discussion, on motion duly made and seconded, the Board

"Referred this matter to the Chairman for discussion with the Department of State."

April 15, 1918, the War Trade Board further considered the matter and the Minutes of the Board of that date show the following:

"(13) Captain Dulles [of the State Department] referred to the Russian sailing vessels, which proposed to sail from Atlantic ports with cargoes of oil for Australia and South Africa, and which had been discussed by the Board on April 9, 1918, as set forth in paragraph (9) of the minutes of the meeting of that day. Captain Dulles reported the opinion of the Department of

State that said vessels should not be permitted to proceed as proposed with their cargoes of oil. Thereupon, on motion duly made and seconded, the Board

"Resolved that the Russian sailing vessels, which proposed to sail to Australia and South Africa with cargoes of oil, should not be permitted to proceed with their cargoes to such destinations."

On April 17, 1918, an employee of the Division of Operations of the Shipping Board who had been directed on April 3 to look into the matter of the obligations of these vessels reported to the Shipping Board as follows:

"Attached is a list of Finnish barks which we intend to charter.

"I took up the matter with Mr. Hay of Messrs. J. F. Whitney and Company who are handling the ships.

"As suggested by you to Mr. Andrews I offered them the bare-boat charter basis at the rate of $1.60. They have cabled to their Agents in London yesterday asking for authority to close the deal with us.

"Mr. Hay informed me that the greatest part of the crew and Masters had the worst reputation. Some of them are openly pro-German and, not considering political feelings, they are far from reliable in many questions, and spend most of their time drinking. Mr. Hay will be glad to see these men depart, but asked me to keep the matter secret until a definite decision is taken, as he fears that the crew will make trouble if they hear that they might be dismissed."

This information was furnished to the War Trade Board.

On April 12, 1918, the chartering committee of the Shipping Board at New York wrote Captain Thomas Fisher, of the British War Mission at Washington, as follows:

"[Re.] *Russian Sailing Vessels:* When you were last here, we talked over the question of the Russian Sailing Vessels Albyn, Prompt, and Professor Koch.

"These vessels were all approved by the Chartering Committee some months back and we could not understand why the War Trade Board was holding them up. They now tell us that all Russian sailing vessels are being held and the matter has been the subject of many discussions before the War Trade Board. It seems to be a question of these vessels being manned by Russian crews and the American Government do not seem to be willing to trust these vessels to go to sea fully manned by Russians.

"This matter you might take up with Mr. Munson and he will, no doubt, be in a position to advise you fully."

On April 20, 1918, the War Trade Board considered the matter of licenses for ship's stores and supplies for certain of the Finnish sailing vessels, applications for which the Board had had before it for some time, and the minutes of the War Trade Board show the following:

"(8) Mr. Munson [member of the Board] stated to the Board that it was desirable that the Bureau of Transportation be authorized by the Board to refuse licenses for bunkers for vessels, the owners, masters, or officers whereof are suspected of enemy affiliations or activities. Thereupon, on motion duly made and seconded, the following resolution was adopted:

"Resolved that the Bureau of Transportation be, and it hereby is, authorized to refuse licenses for bunkers for vessels whereof the owners, masters, or officers are reported by the Bureau of War Trade Intelligence to be suspected of enemy affiliations or of being engaged in enemy activities."

The War Trade Board had, among others, Bureaus of Exports; Imports; Enemy Trade; War Trade Intelligence; Trans-

portation; Administration, and Research.

On April 25, 1918, the Director of Operations of the Shipping Board wrote the Chief of Naval Operations of the Navy Department as follows:

"The Shipping Board intends to charter some Finnish sailing vessels at the port of New York, a list of which is attached herewith.

"The Representative of the owners are in London and we have been in pour-parlers with them through Messrs. J. F. Whitney and Company, 8–10 Bridge Street, New York City, to whom the vessels are consigned and who have been of great assistance to us in this matter.

"We have been informed that the Masters and crews of these vessels are far from being very reliable, some of them being openly pro-German.

"As our principal purpose is to protect the vessels and cargo from possible damage, we have proposed to take them over on a bare-boat basis.

"We hear now from Messrs. J. F. Whitney and Company that the Masters and crews of these vessels having heard of our intention, might make some trouble. On the other hand, the agents in London have not yet given a definite answer to our offer.

"In view of this I believe it is very necessary to have the vessels and the crews well observed until a definite decision is reached in their respect.

"Will you be so kind as to let me know of your decision?"

9. On May 6, 1918, while the matter of chartering the sailing vessels to the Shipping Board on a bare-boat basis was under consideration by J. F. Whitney and Company, the American agent of the vessels and the London agents of the owners, Whitney and Company wrote J. N. Reuter, the Finnish Delegate at the St. Regis Hotel, New York City, as follows:

"Following receipt of yours of the 4th inst., which we really anticipated, cable was sent to our London friends regarding the Russian-Finnish vessels as follows:

"'Ninetythree Reuter after interview Washington officials and conference New York with ten Finnish Masters consulted leading international Admiralty Lawyers states masters crew cannot be retained and advises owners accept shipping boards offer but to strongly insist on generous allowance salary compensation and repatriation expenses.'

"We hardly expect though response from cable before tomorrow.

"We understand the Masters of the 'Albyn' and 'Pampa' are in receipt of further instructions from London to take legal steps to protect their owners' interests so possibly they may get in touch with your good-self before engaging counsel. When you wrote the letter under review possibly you did not go into the conditions of Charter, Bare Boat Form, which we think covers very well the matter of stores onboard, but of course, makes no reference to compensation and repatriation expenses you refer to, which really in our way of thinking would be a gratuitous act on the part of U. S. Government. Has it occurred to you that possibly some arrangement might be made with the Washington Officials to make use of the Masters and Officers of the ships above referred to in positions centering around the manning or navigation of Ocean-going tonnage, and if in your position we would certainly suggest some sort of an arrangement even if it were necessary for the men to undergo a probationary period so as to, in a measure, satisfy the 'Powers that Be' that Captains are not Pro-German, or in other words, can be depended upon to work in interest of the Allies of U. S., Great Britian, France, etc."

The matter of chartering the sailing vessels was never formally considered by the Shipping Board and the Shipping Board did not at any time take any official action looking toward the chartering or requisitioning of any of the Finnish vessels. The matter of possible chartering of the vessels under the circumstances by the Shipping Board on the bare-boat basis, as a means of protection for the vessels and cargoes, was carried on between the War Trade Board and the Director of Operations of the Shipping Board. When these negotiations were terminated on June 10, 1918, and the American agent of the vessels had so notified the London agents of the owners, the latter, on June 17, 1918, wrote the American War Trade Department in London, which it appears was connected with the United States Embassy, in London, to see what could be done about having the vessels released. June 18, 1918, the American Chargé d'Affaires in London cabled the Secretary of State in Washington regarding the inquiry which he had received asking what was required in order to have the vessels released. At this stage, the War Trade Board and the State Department further considered the matter of the granting of export licenses for ship's stores and supplies to the end that the vessels might take on the needed ship's stores and supplies under the statutes and regulations of the War Trade Board and sail with their cargoes and crews. June 20, the War Trade Board instructed the head of the Bureau of Transportation of the War Trade Board as follows:

"Upon agitation with the State Department regarding the following Russian sailing vessels [Albyn, Fahrwohl, Professor Koch, Kensington, and Prompt], they have decided that perhaps it will be all right to let them proceed to South Africa, provided we are perfectly sure that none of the crews are Bolsheviki; or sympathizers with the Bolsheviki regime.

"Please take this up with the Navy and have the crews gone over with a fine tooth comb, preparatory to taking some action towards allowing them to go."

Similar action was shortly afterward taken by the Board with reference to the other Finnish sailing vessels mentioned in Senate bill 334.

10. On June 21, 1918, the Director of the Bureau of Transportation of the War Trade Board, pursuant to instructions of the Board above-mentioned, wrote the head of the Naval Intelligence of the Navy Department as follows:

"All of the above vessels [Russian sailing vessels—Albyn, Fahrwohl, Professor Koch, Kensington, and Prompt] are now at New York, and some of them are loaded and ready to proceed. As you know, the situation with regards Russian vessels has been a somewhat delicate one, and we have felt it was rather unsafe to allow such vessels to proceed.

"I have now received instructions from the Board to take whatever steps are necessary to get them into service and these instructions require me to make sure that none of the officers or members of the crew are Bolsheviki or sympathizers of the Bolsheviki regime. May I not, therefore, request you to please have the crews of these five vessels closely gone over and let me have a report on each vessel separately so that I may be able to determine whether or not certain members of the crew should be discharged and other men engaged in their place. It seems to me it will require men of exceptional ability to handle the situation and I would, therefore, appreciate it if you will see that the proper men are assigned to the work.

"As all of these vessels are ready to proceed, we would like the matter handled as quickly as is consistent with thoroughness."

A few days after the War Trade Board on June 20 took the action mentioned with reference to the five vessels referred to in the letter last above quoted to

the Naval Intelligence Office, the Board took similar action with reference to the remaining sailing vessels. On June 24, 1918, the Naval Intelligence Office was requested "to have the officers and crews of these vessels, also, gone over carefully, as outlined in our letter above referred to. May I not request you to let me have a report on these vessels as soon as the matter can be handled."

The investigations requested by the War Trade Board were made by Naval Intelligence and on June 27, 1918, the Director of Naval Intelligence furnished the War Trade Board with a report of findings with reference to the sailing vessels covered by such investigation, as follows:

"1. Interrogations of the captains of the above mentioned barks [Fahrwohl, Glenard, Kensington, Prof. Koch, Prompt, Parchim, Port Patrick, Pampa, Vidylia, Woodburn, and Rowena], regarding their Bolsheviki tendencies, were conducted by representatives of this Office and are appended hereto.

"2. It will be noticed that these vessels and their crews have been out from Finland from three to ten years, and as communications from Finland with any of the captains or crews have been very infrequent, there is no doubt that newspaper accounts are the basis upon which they form their opinions of the existing conditions in that country.

"3. As a result of these interrogations and from personal observations of the captains and crews of the barks in question, it is the opinion of this Office that there are none of the captains or members of the crews of these barks that have Bolsheviki inclinations. The Bolsheviki or Red Guards have maltreated or killed relatives or friends of nearly all of these crews.

"4. Interviews with Captain E. A. Snell, of the Finnish Bark Woodburn; Captain F. I. Rinne, of the Finnish Bark Port Patrick; Captain Orvar Blom, of the Finnish Bark Glenard; Captain John E. Johannsen, of the Finnish Bark Vidylia; Captain Arthur Anderson, of the Finnish Bark Parchim; Captain A. J. Henrikssen of the Finnish Bark Pampa, and Captain V. Erkssen of the Finnish Bark Rowena, were also obtained, and their opinions coincide with the attached interrogations.

"5. J. F. Whitney & Co. of 8–10 Bridge St., New York City, are the chartering brokers and American agents for these Finnish barks and it has been the custom of these captains to meet in Whitney's office each day. Mr. George T. Hay, Frederick C. Lock and Theodore Dougherty of J. F. Whitney & Co., have become well acquainted with the views of each captain and often engaged them in conversation as to the situation in Finland.

"Messrs. Hay, Lockhart, and Dougherty say that the statements of the captains, which show their ignorance of the political situation in Finland, irrespective of newspaper reports, is correct. Each captain stated that if to his knowledge there was any Bolsheviki feeling amongst the crew of his vessel, he would instantly discharge the offenders because of the trouble that would eventually ensue.

"6. These twelve barks are being operated by J. F. Whitney & Co., for the London agents, Eggar, Forester & Parker, of 2–3–4 Billiter Avenue, London, E. C., who in turn chartered them from the owners' agents in London, H. Clarkson & Co., of 60 Fenchurch St., London, E. C., and Anderson, Becker & Co., of 22 Billiter Avenue, London, E. C.

"7. Five of these barks are loaded, or being loaded in New York Harbor, and the other seven are in ballast awaiting cargo at the same place."

11. On July 8, 1918, this report of the Naval Intelligence was laid before the War Trade Board by the Director of the Bureau of Transportation thereof, as follows:

"Regarding Russian Sailing Vessels, I refer to your memorandum of June 20 instructing me to have the Navy Department go over the crews of the Russian Sailing Vessels with a fine-tooth comb preparatory to taking some action toward releasing them to commerce.

"I now enclose copy of report received from the office of Naval Intelligence. This report would indicate that there are now no objectionable parties among the force of crews of these vessels.

"This report covers, in all, twelve Russian sailing vessels at New York of which I understand at least three are fully loaded and ready to proceed on voyage to South Africa and Australia.

"I would thank you to please let me know if it will be in order to grant licenses to the vessels already loaded; also of the action you want me to take in connection with the vessels not loaded but for which applications have been received."

Upon consideration of the matter, the War Trade Board approved the issuance of bunker licenses for the necessary ships' stores and supplies for the sailing vessels on July 9 and immediately instructed the Director of the Bureau of Transportation of the Board as follows:

"Finnish Sailing Vessels: In view of the report which you have received from Naval Intelligence covering the crews of these Russian sailing vessels and after having taken the matter up with the Shipping Board and the British as well, it will now be in order to release the three vessels which I understand are already loaded and ready to sail, viz: Albyn, Prof. Koch, Prompt, with proper guarantee of return, for their voyages to South Africa."

Similar action was taken by the Board on the same day with reference to two other vessels—Fahrwohl and Kensington, and on July 12 the Board approved the issuance of bunker licenses for necessary ship's stores and supplies for the remaining Finnish vessels and instructed the Director of the Bureau of Transportation of the Board with reference to the Rowena as follows:

"As soon as you have received proper report of investigation of this vessel's crew from the Navy Department, it will be in order to grant bunker license for voyage to Australia, with proper guarantee of return, providing representatives of the Navy Department are satisfied as was the case in regard to the five vessels already released."

On July 10, 1918, "bunker" licenses for necessary ship's stores and supplies were issued to three of the vessels by the War Trade Board on application therefor which had theretofore been made and filed with the Board. On various other dates similar "bunker" licenses were issued by the Board to the other sailing vessels mentioned in the Senate bill 334.

12. The conditions and circumstances which formed the basis of the failure of the War Trade Board to grant licenses for necessary ship's stores and supplies, without which supplies the ships could not sail and without which licenses the ships could not obtain clearance, were (a) the probability of the vessels proceeding through the war danger zone, and, due to their speed, their possible seizure by enemy craft and the appropriation of the cargoes and stores for enemy purposes; (b) the uncertainty of the political situation in Russia and Finland, and (c) the character and responsibility of the officers and crews of the vessels.

There was no detention of any of the sailing vessels named in Senate bill 334 by the United States acting through the War Trade Board, or any other agency, for the purpose of compelling the owners to charter them to the United States.

13. The claims herein reported upon are similar in all basic facts to the original claims decided by the court in the test case of J. A. Zachariassen & Co. v. United States, 94 Ct.Cl. 315, and the *per curiam* opinion in other cases in 96 Ct. Cl. 127, except for the new language of the congressional reference set forth in finding 1 above, instructing the court to report upon both legal and equitable aspects of the claims in all cases. In the present proceedings no additional material evidence on the question of liability, either legal or equitable, or upon damages, has been offered by the parties although they were given opportunity to do so. The plaintiffs have offered affidavits of interested parties to identify the present claimants and owners of the claims who are listed in the petitions and included herein by reference. The claims presented herein have not been transferred or assigned other than by operation of law and the plaintiffs herein are the owners thereof and are entitled to prosecute the same. Defendant offered in these proceedings the additional proof that the minutes of the War Trade Board, dated September 18, 1918, show that the board regulations prohibiting sailing vessels from traversing the submarine danger zone, as defined by the board, resulted in the unemployment of some 200,000 tons of sailing vessels. All the Finnish vessels here involved totaled 20,210 tons. Other than the foregoing the parties rested their proof upon the records in the prior proceeding before the court.

14. The papers accompanying the Senate reference to this court include a memorandum dated September 12, 1951, filed by counsel for plaintiffs with the Senate committee on the judiciary and contains, among other things, representations that the plaintiffs' vessels would not be allowed to sail unless they were chartered to defendant, that suspicions of the crew were those of defendant's agent and the main excuse for detention of the vessels, and that in the prior proceeding in this court plaintiffs were de-

nied a full and complete hearing with relation to the alleged equities in their favor because of the restrictive nature of the original act, 49 Stat. 2368. The committee report, No. 1132, 82d Congress, Second Session, was based upon and incorporated, in part, such representations. These representations and all others made in plaintiffs' memorandum on behalf of claimants before the United States Senate have been carefully reviewed and are found not to be supported by the facts and found to be unsupported by the evidence except to the extent reported in the findings of fact made by the court in these proceedings and in the prior test case of Zachariassen & Co.