ColriNS, Judge,
delivered the opinion of the court:
This is a congressional reference case, filed pursuant to H. lies. 189,1st Sess., 86th Cong., agreed to by the House of Bepresentatives on May 19, 1959. That resolution directed this court to “proceed with * * * [H.B. 5093, a bill for the relief of plaintiff, introduced in the House on February 26, 1959] in accordance with the provisions of sections 1492 and 2509 of title 28 of the United States Code and report to the House of Bepresentatives, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand as a claim, legal or equitable against the United States, and the amount of damages, if any, legally or equitably due from the United States to the claimant, the statute of limitations, the plea of res judicata, laches, any lapse of time, or any prior court decision of this claim by any court of the United States to the contrary notwithstanding. *243 The Court of Claims is directed to consider the records of any previous trial of this case.” (See finding 20, infra.) [1]
Plaintiff is an Illinois corporation, which owns and, since 1925, has operated a hydroelectric power development on the Fox River (hereinafter referred to as the “Fox”) near Dayton, Illinois. Plaintiff’s dam and plant are located 5.75 miles upstream from the confluence of the Fox with the Illinois River (hereinafter referred to as the “Illinois”) at Ottawa, Illinois.
This is the third occasion on which plaintiff has been before the Court of Claims, seeking monetary relief against the Government for losses and damages to its plant. Plaintiff’s persistent contention is that the operation of the Starved Rock dam on the Illinois, 8.7 miles downstream from the confluence of the two rivers at Ottawa, has created the basic conditions responsible for the floodings of plaintiff’s plant. Plaintiff now seeks just compensation for the “taking” of its property by the periodic impairment of the plant’s ability to earn income. In the alternative, plaintiff seeks recovery based upon an “equitable claim” in the broad sense.
The construction of the Starved Rock dam was begun by the State of Illinois and completed by the Federal Government. The dam has been operated by the defendant since 1933. The pool behind the Starved Rock dam extends upstream in the Illinois 13.5 miles and embraces the area of the mouth of the Fox at Ottawa. The dam creates a backwater pool of relatively still water which extends up the Fox approximately 2.5 miles from its confluence with the Illinois. The channel of the Fox below Dayton is narrow and, in its lower half, is tortuous. Its bed is rock. In its natural state, the Fox falls 20 feet from plaintiff’s dam at Dayton to its mouth. Since the construction of the Starved Rock dam, the channel of the Fox has been widened and deepened by the backwater of the pool. As a result, the Fox has lost 8.5 feet of its natural fall from Dayton.
The area involved in northern Illinois has severe cold weather each year. The weather records show no significant *244 change since 1870. Before was pool filled in 1983, floods did occur in the area, but they were due not to ice jams but primarily to heavy rains and to melting snow. The floodwaters could and did flow down to the Illinois. The unusual ice jams in 1943,1952, and 1960, have caused the water above the pool to rise to levels which have flooded plaintiff’s powerplant and equipment. Within a space of 17 years, 1943-60, plaintiff has suffered extensive damage from the three major winter floods. On a number of other occasions, ice jams of lesser magnitude occurred in the Fox, but plaintiff seeks no damages on account of these minor jams.
The first of the major ice jams within the ice gorges, that flooded plaintiff’s powerhouse to a depth of 4.5 feet, occurred in March 1943. (See finding 15, infra.) Plaintiff’s machinery and equipment were damaged and the plant was closed down and out of operation between March 3 and April 16,1943. Thereafter, on December 26, 1944, plaintiff filed its first suit against the United States. Plaintiff alleged then that its damage resulted from the Starved Bock dam. After a full trial on the merits, this court denied relief and dismissed plaintiff’s petition. North Counties Hydroelectric Co. v. United States, 108 Ct. Cl. 470, 70 F. Supp. 900 (1947).
The dismissal of the first suit was based in part upon plaintiff’s failure to prove at trial that the Starved Bock dam caused the flooding (i.e., that the 1943 ice jam on the Fox Biver was continuous from the frozen pool of the Starved Bock dam to plaintiff’s plant, 3% miles upstream). Secondly, the court found that “whether there will be a periodical recurrence of the 1943 ice condition resulting in permanent damage to plaintiff’s property is purely speculative” (at p. 484). The court stated “that the flooding of an owner’s land on but one occasion does not constitute a taking” (at p. 485), citing Peabody v. United States, 231 U.S. 530 (1913); Portsmouth Harbor Land & Hotel Co. v. United States, 250 U.S. 1 (1919); and other cases.
Plaintiff’s second action was filed in 1953 after another severe flooding which occurred in January and February 1952, and one of less severity in 1946, which, however, did *245 not enter the powerplant. In Jannary 1952, plaintiff’s generator floor was, as 9 years previously, 4.5 feet under water. Plaintiff was compelled to close its plant from January 29 to February 17,1952. The Trial Commissioner in that case found that the Starved Rock dam was the cause of the 195'2 flooding, as well as the probable cause of the earlier flooding in 1943. However, the court sustained the defendant’s plea that the first decision was res judicata, and, therefore, dismissed the petition without considering the merits. North Counties Hydro-Electric Co. v. United States, 138 Ct. Cl. 380, 384, 151 F. Supp. 322 (1957).[2] The court explained its holding as follows (at 383):
* * * In the first case, as in this, it was necessary to show the inevitability of the recurrence of these floods. Intervening events have made this no more possible now than it was then.
Plaintiff has had its day in court and, under the rule of res adjudicata, it cannot again litigate the same issue heretofore tried in the same cause of action against the same defendant.
Also, the court noted that the issue of causation of the ice jam “was tried in the first action and was decided adversely to plaintiff for failure of proof” (at 383). The opinion further stated (at 382) that “Two floodings * * * do not constitute a taking.” The court cited United States v. Cress, 243 U.S. 316 (1917), and other cases.
In the First Session of the 86th Congress, the bill for the relief of plaintiff (H.R. 5093) was introduced, and by H. Res. 189, sufra, was referred to this court.[3] The third and present action was filed on July 24,1959, pursuant to H. Res. 189. (See finding 20, infra.) The matter was referred to another Commissioner, whose report of findings of fact is *246 adopted by this court, with certain modifications, and is incorporated into this decision infra.
Eight years after the second flood, or in Jannary 1960, the day before the trial of the present action was to begin, a third ice jam occurred, which was much greater in magnitude, duration, and destruction than those in 1943 and 1952. As a consequence, plaintiff’s plant was flooded to a depth of 10 feet. Plaintiff was forced to suspend all operations from January 21 to May 7,1960. The plant did not become substantially operative until June 14, and intermittent trouble with the equipment was encountered until September 1960. (See finding 22, infra.)
The court now finds that the ice gorges,[4] within the ice jams, located in the Fox Fiver above the Starved Rock dam, impeded the flow of the Fox and contributed substantially to the floodings of plaintiff’s plant, in 1952 and 1960, if indeed they were not the principal immediate causes of those floods. (See findings 22, 28, and 24, infra.) The heavy cover of sheet ice in the still water of the Starved Rock pool was the barrier that held the ice in the Fox River in each of those years. This enabled frazil ice floating downstream to accumulate and build back upstream in such a way that it blocked the Fox River’s flow and egress. This caused the flooding of plaintiff’s plant. The evidence does not show positively that it had the same effect in 1943, but it does not dispel the possibility that it did.
There is nothing in the record to show that, among the many freezes in the Fox prior to 1933, there were ever such ice jams with resultant ice gorges and flooding of plaintiff’s property, as plaintiff has complained about in its three actions. Nor does the record contain any clear or persuasive evidence that any such ice gorges ever formed in the Fox, except behind a blockage of ice in the Starved Rock pool. (See finding 29, infra.)
Like many congressional reference actions, the instant case presents two separate questions: first, whether plaintiff has a claim of the type cognizable by a court of law or equity; and, second, whether plaintiff has an “equitable claim” in the broad, moral sense.
*247 Regarding the first alternative, the precise issue is whether or not plaintiff has shown a “taking” (actually, a partial taking) of its property by the Government. If operation of the Starved Rock dam has resulted in a taking, then, under the Fifth Amendment of the Constitution, plaintiff would be entitled to just compensation. In each of the prior actions, plaintiff asserted unsuccessfully that the Government had taken property of plaintiff. Now, to support its position that plaintiff has no legal claim, defendant relies in part upon the doctrine of res judicata.
This court finds it unnecessary, however, to pass upon the question of the applicability of res judicata to plaintiff’s legal claim. We are of the opinion that, without regard to the operation of res judicata, there is a sufficient basis for holding that plaintiff has no valid claim for a taking. The contention of plaintiff that its property was taken is based upon the principles of United States v. Cress, 248 U.S. 316 (1917). The factual situation, with regard to one of the plaintiffs in United States v. Cress, involved the erection by the Government of a lock and dam on a navigable river. As a result, the plaintiff’s land, which was located on a tributary of the river, was subjected to a permanent condition of frequent overflows of water from the river. In holding that compensation was in order, the Supreme Court made the following statement (p. 328):
* * * There is no difference of kind, but only of degree, between a permanent condition of continual overflow by back-water and a permanent liability to intermittent but inevitably recurring overflows; and, on principle, the right to compensation must arise in the one case as in the other. * * *
Thus, in the instant case, plaintiff has the burden of showing that, because of the operation by the Government of the Starved Rock dam, plaintiff’s hydroelectric plant became “[permanently liable] to intermittent but inevitably recurring overflows.” Trial Commissioner Robert K. MeCon-naughey determined that “* * * there is no adequate basis for a positive finding that * * * [ice jams such as those which led to the flooding of plaintiff’s plant] will recur inevitably * * (See finding 31, infra.) This court is in *248 agreement with the determination of Commissioner McCon-naughey, and the conclusion necessarily follows that plaintiff has failed to establish that its property was taken by the Government.
Despite the fact that damaging floods took place in 1943, 1952, and 1960, this court cannot say that the recurrence of such floods is inevitable. As pointed out by the Trial Commissioner, formation of the ice jams which resulted in the flooding of plaintiff’s plant requires the existence of a peculiar combination of physical factors, including certain weather conditions. We are unable to state that the occurrence in the future of the necessary concatenation of physical conditions is certain. Therefore, quite apart from the matter of res judicata, plaintiff has no legal claim.
However, our holding that plaintiff has no legal claim (i.e., no claim of the type cognizable by a court of law or equity) does not dispose of the case. Consideration must be given to the question of an “equitable claim” in the broad, moral sense. In Burkhardt v. United States, 113 Ct. Cl. 658, 667, 84 F. Supp. 553 (1949), this court stated:
We are therefore of the opinion that the term “equitable claim” as used in 28 Ü.S.C., Sec. 2509, is not used in a strict technical sense meaning a claim * * * [cognizable] by courts of equity, but [is used in] the broader moral sense based upon general equitable considerations. * * *
This court has followed the Burhhardt concept of “equitable claim” in numerous cases,[5] and, despite defendant’s assertion to the contrary, we consider that concept to be applicable to the instant case.
Furthermore, the doctrine of res judicata does not preclude plaintiff from asserting an “equitable claim” within the meaning of Burkhardt v. United States, supra. Neither of the prior actions brought by plaintiff in this court was a congressional reference case. Therefore, the question of an “equitable claim” in the broad sense was not and could not have been before the court in either of the previous actions. *249 Cf. Rumley v. United States, supra, at p. 108. Accordingly, res judicata is no bar to plaintiff’s “equitable claim.”[6] As the court said in J. A. Zachariassen & Co. v. United States, 136 Ct. Cl. 68, 68, 141 F. Snpp. 908 (1956), “* * * in a Congressional reference such as this, the court will further consider the equitable side of the claims even though the legal questions have been disposed of previously.”
We feel that application of the BwrMiardt concept of “equity” is especially appropriate because of the similarity in facts between that case and the present one. Burkhardt v. United States, supra, involved the erection by the Government of a dam which interfered with the plaintiffs’ hydroelectric plant. The congressional reference action was brought after the plaintiffs’ unsuccessful attempt to recover for the “taking” of their property.[7] Thus, it was clear that the plaintiffs had no legal claim. Still, this court held that the plaintiffs had an “equitable claim” in the broad sense. It was for Congress to determine whether the plaintiffs should be compensated. 113 Ct. Cl. 658, 669.
In the instant case, as indicated above, there has been no “taking” of plaintiff’s property. ,The element of inevitability of the recurrence of the floods is not present. Nonetheless, the fact remains that, upon three occasions, serious damage has been done to plaintiff’s plant. Furthermore, the Trial Commissioner found that the presence in the Fox of the backwater pool created by the Starved Kock dam was a “substantial, and probably an essential, factor in causing *250 damage to plaintiff’s plant * * * in 1952 and 1960” and “probably * * * a factor, also, in causing the 1943 damage * * (See findings 42(a) and 24(a), infra.) This court is of the opinion that the causal relation between defendant’s operation of the Starved Rock dam and the damage to plaintiff’s plant was such that plaintiff does have an “equitable claim” in the moral or nonjuridical sense. Our conclusion extends to the 1943 flood as well as to those in 1952 and 1960. As was the case regarding Burkhardt v. United States, supra, whether or not plaintiff should be compensated is a matter for Congress to decide.
With regard to the amount of plaintiff’s damages, the parties have stipulated that the 1943,1952, and 1960 floods have resulted in loss of power revenues and in expense for repairs to the extent of $137,058. (See finding 42(b), infra.) The stipulated amounts are as follows:
Loss op Power Revenues
1943_ $20,151
1952_ 10,155
1960_ 49,933
Cost op Repairs
1943_ 23,907
1952_ 16,160
1960_ 16,752
$137,058
This court is of the opinion that recovery of the entire amount stipulated would be proper.
Defendant argues that we should not include in our report to Congress any mention of the 1960 flood, since that flood occurred subsequent to the passage of the resolution which referred the instant case to this court.[8] We do not agree with defendant’s assertion. Evidence was taken and findings have been made regarding the 1960 flood. Under these circumstances, we deem it wholly appropriate to include consideration of that flood in our report to Congress and thus *251 obviate additional litigation. Accordingly, in determining the proper amount of compensation, we do not exclude the damages attributable to the 1960 flood.
Plaintiff’s recovery should include not only the stipulated amount, but also compensation for the delay in payment of plaintiff’s losses. Cf. Burkhardt v. United States, supra, at 669. For more than 20 years, plaintiff has persistently sought a remedy for its losses and damages. It has had three extensive trials in litigating the issues at great expense. The broader equity demands that an allowance be made for the delay in payment. The court feels that an adequate and compensable amount would be $50,000. We recommend that Congress authorize payment to plaintiff of $50,000 in addition to the stipulated losses of $187,058, or a total payment of $187,058.[9]
Plaintiff seeks also to recover $79,689. as anticipated losses which would result from future floods during the remaining life of plaintiff’s property. This court is of the opinion that plaintiff is not entitled to receive $79,689, or any other amount by reason of anticipated losses. Under our view of plaintiff’s “equitable claim,” recovery should be limited to compensation for the stipulated losses and for the delay in payment.
In conclusion, this court finds that plaintiff has no legal claim, but that plaintiff has an “equitable claim” in the broad sense. The amount “equitably” due plaintiff from the United States is $187,058.
This opinion and the findings of fact, as modified herein, will be certified by the Clerk of this court to the House of Representatives, pursuant to House Resolution 189, 86th Congress, 1st Session.
FINDINGS OP PACT
The court, having considered the evidence, the report of Trial Commissioner Robert K. McConnaughey, and the *252 briefs and arguments of counsel, makes findings of fact as follows:

Plaintiff's Power Project

1. (a) Plaintiff is an Illinois corporation. It owns a Hydroelectric waterpower development on the Fox Eiver (hereafter called the Fox), near Dayton, Illinois, about 5.75 miles north and upstream from the mouth of the Fox at Ottawa, Illinois, where the Fox flows into the Illinois Eiver (hereafter called the Illinois).
(b) Plaintiff’s property consists of a dam across the Fox, a headrace, a powerplant with generators, a tailrace from the powerplant to the Fox, and rights of overflow of other lands for approximately 4.5 miles upstream from the dam.
2. (a) Plaintiff’s predecessors in interest, Fred D.. Breit (now plaintiff’s president) and the State of Illinois, applied jointly, in 1923, to the Federal Power Commission, under those provisions of the Federal Power Act which deal with navigable waterways of the United States, for a license to build and operate a hydroelectric plant at the site where plaintiff’s plant is now located.
(b) In 1924 the Federal Power Commission issued, and the applicants accepted, license No. 287, under those provisions of the Federal Power Act.
3. The plaintiff has succeeded to the interests of Breit and the State,[1] and in 1925, plaintiff commenced the operation of its project.
4. All of the electricity produced by plaintiff’s development, except a small amount used in the maintenance and operation of the powerplant itself, is sold to the Illinois Power Company at a flat rate of one-half cent per kilowatt-hour under a contract dated December 20,1923, and extending for 40 years thereafter. The Illinois Power Company *253 has an option to renew the contract on the same terms for a period of 20 years.

The Starved Booh Dam

5. (a) The Illinois Waterway project, of which the Illinois forms a part, was begun by the State of Illinois. It was taken over and completed by the United States under authority of the Eivers and Harbors Act of 1930, and has since been operated by the United States as a navigational aid. The navigable channel of the Illinois is maintained by the operation of a series of dams that raise the normal water elevations.
(b) One such dam is located at Starved Rock, Illinois, about 8.7 miles downstream from the confluence of the Fox and the Illinois at Ottawa. The Starved Rock dam has a lock and 10 gates which are raised and lowered to maintain pool elevations above the dam. The gates are kept raised when the natural flow of the river is sufficient to maintain required pool levels. They are operable throughout the year. There is no waterpower development at the dam. It is upon the alleged effects of the operation of the Starved Rock dam that plaintiff bases its claims in this case.
(c) The Starved Rock dam was completed by the United States in 1932. By February 1,1933, the water had reached project pool elevation of 466.5 feet at the dam. By March 1933, the other pools of the Illinois Waterway above the Starved Rock dam had been filled with water to project elevation and by June of 1933, the Illinois Waterway, from Starved Rock to Chicago, was officially open for navigation.
(d) The pool behind the Starved Rock dam extends upstream in the Illinois approximately 13.5 miles to the Marseilles dam. It embraces the area of the mouth of the Fox at Ottawa to the extent hereafter described. This area at the mouth of the Fox, and extending upstream in the Illinois to the Marseilles dam, is known as the upper pool. The water level of the pool behind the Starved Rock dam is the same as the level of the pool below the Marseilles dam next above it. Above the pool created by the Marseilles dam there are other pools resulting from dams at Dresden Islands and Brandon Road near Joliet.
*254 (e) The Starved Rock dam has, since 1933, been and now is operated and controlled by the United States in the interest of navigation and is operated for that purpose throughout the year.
(f) The structural features, height, and method of operation of the Starved Rock dam and the normal level of the pool behind it have been unchanged since operation of the dam was begun in 1933, except that, in the winter of 1942-43, the United States commenced using ice breakers in the pool to keep the channel of the Illinois open to navigation and has continued to do so when necessary in the winter since then.

Physical Characteristics of the Fose

6. From the plaintiff’s dam at Dayton to its confluence with the Illinois (except in the lower portion where the backwater from the Illinois is comparatively still), the Fox is a swift stream, generally shallow, but of varying depths. Its depth depends, primarily, upon the amount of flow in the Fox which, in turn, is affected by varying conditions of rainfall and runoff in the area that drains into it. The bed of the Fox, below Dayton, is rock. Except as it is widened and deepened by the backwater of the Starved Rock pool for about 2.5 miles up from the mouth of the river, the channel of the Fox, below the Dayton dam, is narrow and, in its lower half, tortuous. In its natural state, the Fox falls about 20 feet in the 5.75 miles between Dayton and its outlet into the Illinois.
7. The Starved Rock dam raises the surface elevation of the Illinois at low water flow about 8.5 feet and creates a backwater pool of relatively still water (hereafter called the Starved Rock pool) in the Fox, which extends about 2.5 miles up the Fox from its confluence with the Illinois. Without the Starved Rock dam in operation, there would be no backwater extending up the Fox, and the fall between the plaintiff’s tailrace and the mouth of the Fox, where it flows into the Illinois, would be about 8.5 feet greater than it is.
8. The outline map which appears as figure 1, infra, shows the approximate course of the Fox, below the Dayton *255 dam, as well as various obstructions in that part of the Fox. These include:
(a) Two highway bridges, a railroad bridge, and an aqueduct in the lower reaches of the Fox near Ottawa, each with piers or abutments in the river.
_ (b) _ Two sharp, U-shaped bends, curved in opposite directions, which, together, give the Fox an S-shaped course above the bridges to a point about 3 miles above its mouth and about a half mile above the head of the Starved Eock pool.
(c) Island No. 8, which splits the channel of the stream for about 1,400 feet midway between the two sharp bends, about one-third of the distance between the Dayton dam and the mouth of the Fox.
(d) Island No. 4, about 900 feet long, which lies in the upper bend above the head of the Starved Eock pool.
(e) A cluster of three small islands (Nos. 5, 6, and 7) toward the west bank of the river, well above the upper bend, and
(f) The Dayton bridge, about 1,100 feet below the Dayton dam.
The normal head of the Starved Eock pool is slightly above the upper end of Island No. 3. Islands, referred to in the trial as Islands 1 and 2, which formerly were exposed, are under water within the area of the Starved Eock pool. The channel, adjacent to one of these submerged islands, is somewhat shallow and constricted.

Types of Icing Conditions

9. The record contains evidence that describes at least three types of icing conditions. Two have a direct bearing on the issues in this case, and there is some evidence that the third may have some material significance.
(a) Sheet ice is flat, solid ice which forms on the surface of the water. It forms more readily and remains longer over a relatively still body of water than over rough or fast-moving water. Customarily, sheet ice extends from shore to shore, except where it may be (1) melted, in warm spots, (2) broken by the combined effect of thawing and movement of the water in the stream or by a change of the water level in the river, or (3) eroded by agitation of the water by the current, especially over rough stretches, or by the inflow, from *256 tributary watercourses, of warmer water or water containing substances that reduce its susceptibility to freezing. Generally, although sheet ice is likely to form more readily over shallow water than over deep water, its formation is affected more by rate of flow and especially by agitation than it is by depth.
When sheet ice breaks up, it floats in the water and, if the floating pieces encounter obstruction or are immobilized by subsequent freezing, they may form a solid, rough mass of irregular chunks.
(b) Frazil ice (also known as slush ice, cotton ice, and needle ice) is formed in turbulent water when the water is supercooled by contact with a cold air mass. Agitation of the water is necessary to its formation. It does not form in still water. It can form at any temperature below freezing but it forms faster as the temperature drops. Both the degree of the temperature and the length of time low temperatures persist directly affect the amounts formed.
Ideal conditions for the formation of frazil ice include situations where a thaw or other disruptive influence that breaks up sheet ice (under which frazil ice will not form) is followed by a severe drop in the temperature, accompanied by circumstances that induce turbulence in the water.
Frazil ice forms first as small circular disks. These, as they grow, send out spiny shoots, known as dendrites, which help the particles to pack together into larger masses.
Frazil ice particles, riding in the water in their incipient form before they have massed together into substantial accumulations, are not always visible. They float downstream until they either evacuate or melt, unless they meet some barrier against which they lodge and accumulate, or unless they are frozen together into a rough sheet over the surface that is essentially similar to sheet ice and is commonly referred to as knitted ice.
Although frazil ice ordinarily does not form under sheet ice, in some circumstances, it may lodge against or under sheet ice and, adhering there and catching other particles of frazil ice, broken sheet ice, and other solid material coming downstream, may build up a barrier that seriously impedes the passage of water.
*257 Once it starts to accumulate against an obstruction, if conditions for its formation persist, frazil ice is likely to accelerate tbe formation of a gorge, and may build back upstream very rapidly as more frazil ice (accompanied or not, as may be, by broken sheet ice and debris of various sorts) follows downstream and piles into tbe growing accumulation behind the barrier.
The likelihood of a gorge forming in this way depends not only upon the length of time over which the coincidence of the weather and other physical factors essential to the formation of substantial quantities of floating ice persist but upon the existence of obstacles to harmless evacuation of the floating ice. The presence, in a stream, of obstacles, against which floating ice may lodge and behind which it may accumulate, enhances the likelihood that ice jams of this sort may form, grow to damaging size, and create gorges which impede the flow of the stream.
(c) Anchor ice forms on rocks at the bottom of a stream, as a result of cooling of the rocks to a point below freezing, so that water freezes on contact with them. Frazil ice may cool rocks or other obstructions upon striking them and may adhere to them. Accumulations of frazil ice, so formed on rocks in a stream, are sometimes referred to as anchor ice. It is only in this sense that the term “anchor ice” may have significance in this case. There is evidence that frazil ice, formed in the turbulent water going over the Dayton dam, adheres to rocks and other obstructions below the dam and accumulates there.

Weather Conditions Affecting Ice Formation in the Fox

10. (a) Plaintiff’s property and the waterways which present the problems to be dealt with in this case are located in northern Illinois. The area typically has several periods of severe cold weather each year. Both the Starved Bock pool and the Dayton pool above the dam frequently are covered by sheet ice, which comes and goes, depending upon varying physical conditions, mainly, fluctuations in temperature and in the flow of water in the river.
(b) Because of the shallow, turbulent nature of the Fox and the pattern of winter weather that prevails in the area, *258 conditions propitious for the formation of frazil ice usually occur at least two or three times each winter. The Fox is less turbulent above than below plaintiff’s dam. Accordingly, it is less apt to produce frazil ice above the dam than it is in the stretch below, although it is clear from the evidence that frazil ice does form above the dam and that the turbulence, engendered by the dam itself and by the boulders and other obstacles immediately below the dam, is conducive to the formation of frazil ice.
(c) Weather records, covering the period since 1870, show no significant change in the weather pattern in the region of the Fox during that period, either before 1938, or since.

History of loe in the Fox Before 1933

11. (a) Over the years, the combination of physical and climatic conditions that affect the Fox has caused ice to form frequently in the river, between the plaintiff’s dam at Dayton and the mouth of the river at Ottawa, both before the building of the Starved Bock dam, and since.
(b) The evidence concerning the existence, character, and effect of ice in the Fox since 1933, when the pool formed by the Starved Bock dam reached project elevation, is substantially more specific and detailed than the evidence concerning the quantity and character of ice in the river before that time.
12. (a) The evidence shows that ice was present in the Fox, below Dayton, in substantial quantities, from time to time before 1933, and that there were floods there, but does not plainly show that any jams or gorges that occurred during that prior period were of the sort formed by floating, frazil ice, backed up as far as Dayton from some common point of obstruction downstream, or that the floods that occurred then were caused by the presence of ice in the Fox. Such evidence as there is tends to indicate that the earlier floods were caused, primarily, by heavy rains and melting of snow and ice during relatively warm periods and that the rising waters washed out ice that had previously formed.
(b) A dam, built across the Fox in 1839, was destroyed by either ice or floods in 1902. Measurements of the flow of the Fox based on stream gauge readings, taken at Dayton *259 before the plaintiff’s plant was built, frequently were inaccurate because of ice jams in the river during high-water periods. Although old residents in Dayton testified that, as far back as 1891, they never saw an ice gorge in the Fox comparable to the one that occurred in 1943, old newspaper accounts indicate that severe ice jams of some sort occurred in the Fox, between Dayton and Ottawa, in 1849, 1857, and 1916.
Taking all of the evidence into account, it is apparent from the record that there was often ice in the Fox before 1933, but it is not clear that such ice jams as occurred there before 1933 were of the sort, caused by massive accumulations of frazil ice, formed in cold spells, that have caused direct damage to the plaintiff’s plant three times since then by backing up the water of the Fox into the plant, as distinguished from jams of floating ice, broken up and carried downriver during relatively warm periods by waters already at flood stage by reason of heavy rains and melting snow and ice upstream.

Relatively Minor Ice Jams Since 1933

13. (a) Frequently since 1933 ice has formed in the Fox, either in such form or in such relatively small quantities that, although it may, at times, have caused reduction of the effective head of water at the plaintiff’s plant, it did not cause the plant to be flooded or its equipment to be physically damaged. Such relatively less harmful icing conditions are shown to have occurred in February 1936, January 1937, February 1937, March 1937, March 1939, March 1940, February 1941, March 1941, February 1942, December 1942, January 1943, January 1946, and again between January 4 and January 12, 1960. It is a reasonable inference that other relatively minor jams occurred with comparable frequency at other times between 1933 and 1960.
(b) Plaintiff apparently does not press a claim for damages resulting from reduction of the effective head of water at its power plant, caused by the smaller ice jams that have occurred since 1933.
(c) The evidence concerning these smaller jams is not sufficiently detailed to indicate whether their inception was *260 attributable to jamming of frazil ice behind sheet ice covering the Starved Rock pool. In the- absence of detailed evidence as to how they commenced, the fact that they occurred is of limited significance with respect to the basic issue for decision.

Basic Natwre of Three Major Ice Jams Since 1933

14. (a) The type of ice jam of which the plaintiff primarily complains as the cause of damage to its property is one so severe that it blocks the flow of the river sufficiently to cause the water at Dayton to rise to a level where it floods, and directly damages the plaintiff’s plant and equipment.
(b) Each of the three ice jams since 1933 that directly damaged the plaintiff’s plant was formed during a relatively cold period, free of excessive rainfall or melting snow or ice, by the building back in the Fox of an increasing accumulation of ice and river debris to a point immediately below the Dayton dam. This mass of material, backed up in the river to the face of the dam, severely impeded the river’s flow and caused the water level at the plant to rise sufficiently to flood it. Jams of this type characteristically have their inception with the lodging of an accumulation of floating ice and river debris against an obstruction downstream. The one in 1952 and the one in 1960 appear clearly to have begun with jamming of floating ice against sheet ice in the Starved Rock pool and to have extended continuously from that point upriver to the plaintiff’s dam.
(c) The evidence affords a basis for an inference that the 1943 jam was of the same type, although the observations of the river that are in evidence are inadequate to dispel a possibility that the 1943 jam might have been interrupted at some unobserved point between the blockage in the Starved Rock pool and the ice, jammed in the river immediately below the plaintiff’s plant, that was visible to the observers who testified. Accordingly, on the direct evidence, the possibility remains that the part of the gorge that immediately caused the damage in 1943 might have had its inception at some unobserved point in the river above the head of the Starved Rock pool.

*261
The 19]$ Flood

15. (a) The first ice jam that caused direct flood damage to the plaintiff’s plant occurred in March 1943. It was the ultimate result of weather conditions that caused ice to be in the Fox continuously, in varying forms and quantities, from early December 1942 until the plant was flooded in March 1943.
(b) Temperatures were extraordinarily low through early December. By the middle of the month, the Illinois was frozen at least 9 inches thick, 12 to 14 miles upstream from the Starved Bock dam. Heavy ice remained in the Illinois through the rest of December and thick sheet ice formed in the Starved Bock pool in the Fox.
(c) About January 7,1943, sheet ice that had formed over the Dayton pool broke up, came over the Dayton dam, and floated downstream in the Fox, along with some slush ice.
(d) Early in January, broken sheet ice, augmented by slush and mixed with logs, trees, and rubbish, coming downstream in the Fox, was observed as far upstream as the upper large bend near Island No. 4. Little, if any, of this material escaped from the Fox into the Illinois in solid form during the winter of 1942-43. It lodged against sheet ice, which covered the lower part of the Fox in the Starved Bock pool, and stayed there, except as some of it may have melted and worked its way out under the sheet ice.
(e) Through February, the river alternately thawed and froze, but the mouth of the Fox was never clear of sheet ice, which remained in the river as far up as the highway bridge at Ottawa, with chunks of broken ice, logs, and other debris, lodged behind it.
(f) Late in January and during February, ice was observed from the Dayton bridge, jammed in the Fox, somewhere between a half mile and a mile downstream from the bridge. Later, however, this ice moved downstream so that, at one period in February after it was first observed, it was no longer visible from the Dayton bridge.
(g) Still later in February, additional quantities of slush ice came over the Dayton dam and floated downstream.
*262 (b) Toward the end of February, accumulations of ice and slush again became visible downstream from the Dayton bridge. This accumulation built back upstream rapidly until it passed the Dayton bridge late in February or early in March. By March 3,1943, ice was jammed in the Fox, both below and above the Dayton bridge, ending at the lower face of the plaintiff’s dam, almost level with the top of the dam.
(i) At this time, the ice reached the floor of the Dayton bridge. The level of the ice jammed above the bridge was higher than that downstream from the bridge. There is an inference from this that the bridge itself was responsible, to some extent, for the fact that the ice piled up higher above the bridge than it did downstream from it and, consequently, that the bridge contributed, to some extent, to the intensity of the jam above the bridge.
(j) No one who testified observed the condition of the river in 1943 between the upper bend in the Fox near Island No. 4 and the limit of visibility downstream from the Dayton bridge. Accordingly, the evidence does not show the condition of the river between those points, either while the jam was forming or when it was at its peak, and there is no proof based on visual observation that the 1943 jam was ever continuous between the sheet ice in the Starved Bock pool and the Dayton dam.
(k) On March 3, the plaintiff’s powerhouse was flooded by water backed up behind the jammed ice which had reappeared below the Dayton bridge late in February and within a few days had built back upriver to the face of the plaintiff’s dam. The water level at the powerplant fluctuated — sometimes quite rapidly — as the water, dammed behind the barrier of the jammed ice, found temporary ways, across, under, or through it, then was blocked again. By March 8, it reached its greatest depth of about 4.5 feet in the powerhouse. Plaintiff’s machinery and equipment were damaged and its plant ceased to operate between March 3 and April 16,1943.
16. After the 1943 flood, the plaintiff sued the United States, in this court, in a case docketed No. 46274.[2]
*263 After a full trial on tlie merits, the court dismissed the plaintiff’s petition.[3] The court stated two grounds for the dismissal:
(a) That the plaintiff had failed to prove that the erection of the Starved Rock dam caused the ice jam that backed up into plaintiff’s plant, and
(b) That it was purely speculative whether there would be a periodical recurrence of the 1943 ice condition, resulting in permanent damage to the plaintiff’s property.
The first of these determinations was based on the court’s conclusion that the evidence in the record of the first trial failed to establish that the ice jam which caused damage to the plaintiff’s plant began at the backwater in the Fox created by the Starved Rock dam and extended, without interruption, all the way up to the plaintiff’s plant.
17. (a) The present record contains no additional direct proof of the condition of the river during the creation and culmination of the 1943 jam and flood to supplement the limited observations made in 1943 upon which the plaintiff based its claim in the first trial. Accordingly, there is no more specific evidence now than there was then that the ice jam that backed the water into the plaintiff’s plant and caused the damage in 1943 had its inception against the blockage created by sheet ice in the backwater formed in the Fox by the Starved Rock dam, rather than at one or another of the obstructions upstream in the unobserved section of the Fox.
(b) The record contains conflicting opinion evidence as to whether the obstructions upstream from the head of the Starved Rock pool were of a kind that could or would be likely to initiate ice jams.
There was opinion evidence at the first trial that the physical nature of the channel of the Fox below Dayton was susceptible to the formation of ice jams initiated by any of several of the upstream obstructions and that sheet ice on the surface of a backwater like the Starved Rock pool, no matter how thick, would not be likely to cause a gorge. The latter opinion appears plainly to be contradicted by the facts concerning the later floods.
*264 The second trial added contrary opinion evidence that, taking account of the slope of the river and other physical factors disclosed by the record, and applying certain engineering principles and formulas (the applicability of which was challenged on the record), none of the upstream islands or upstream bends in the Fox above the head of the Starved Rock pool afforded a sufficient anchor to hold against the pressure of ice and water that would exist when a gorge built back upstream as far as the Dayton dam and, accordingly, that none of these upstream obstructions was a likely starting point for an ice gorge of the kind that caused the flooding of the plaintiff’s plant. According to this expert, the sheet ice in the Starved Rock pool was the only place where a jam of that size would be likely to start in the Fox.
(c) There is no specific evidence in the record of any of the three trials which shows affirmatively that any jam in the Fox that built back as far as defendant’s dam ever had its inception in the vicinity of Islands Nos. 5, 6, and I, or at any other point in the river above the upper limit of the Starved Rock pool.
(d) In the absence from the present record of evidence to show the condition of the river at any time in 1943, between Island No. 4 and the limit of visibility downstream from the Dayton bridge, the fact that jammed ice appeared within view downstream from the Dayton bridge, then disappeared and later reappeared, does, however, suggest a possibility that a separate jam could be, and, in 1943, may have been initiated by some obstruction upstream from the Starved Rock pool. The proof leaves it uncertain whether the jam that finally caused the flooding of plaintiff’s plant in 1943 was continuous downstream to the Starved Rock pool or had its inception at some unobserved point upstream.
On the record as it now stands, it remains conjectural whether the ice that first became visible from the Dayton bridge in January, and later disappeared, was the upper end of a continuous jam, commencing in the Starved Rock pool, that merely shrank and receded during the interval of warmer weather in February, to be augmented later to such an extent as to cause the flooding of plaintiff’s plant, or was a separate upstream jam that commenced at some point *265 upriver from the head of the Starved Nock pool. If it was the latter, at least three additional conjectural possibilities exist:
(1) that it broke loose and moved downstream when the weather moderated, and was replaced later by another upstream jam that caused the flooding;
(2) that it broke loose and moved downstream when the weather moderated and, having joined the mass already accumulated there, was later augmented as part of a continuous jam that caused the flooding, or
(3) that it merely receded toward its upstream anchor during the warm spell, to be later augmented — still as a separate upstream accumulation — into the jam that caused the flooding.
(e) Considering all the proof from the three trials, available in the present record, the evidence does not dispel the possibility that the jam that ultimately reached the face of the dam and caused the plant to be flooded in 1943 might have begun at some unobserved point between the upper bend in the Fox and the limit of visibility downstream from the Dayton bridge. In these circumstances, the record does not afford an adequate basis for a positive finding that the existence of the Starved Eock pool was the cause of a continuous jam in 1943 which resulted in the flooding of the plaintiff’s plant that occurred that year.

The 1952 Flood

18. (a) The second ice jam that caused the plaintiff’s plant to be flooded occurred in the winter of 1952.
(b) Between January 14 and January 20, 1952, a thaw caused sheet ice that had formed over the Dayton pool to break up and go over the Dayton dam and downriver. This ice lodged against a barrier of sheet ice that then covered the Starved Eock pool as far upriver as the first bend in the Fox above the bridge at Ottawa. Additional broken sheet ice, slush, and debris followed and added to the congestion.
(c) From January 24 through January 30, low temperatures returned and frazil ice formed in the river. It packed into the other ice already jammed downstream and, eventually, the accumulation built back upstream until it passed the *266 bridge at Dayton and extended to the lower face of the plaintiff’s dam. At the dam, the jam reached a height about 3 feet below the top of the dam. At its peak, the ice was continuous from Ottawa to the Dayton dam except for relatively small areas of open water here and there. A pressure ridge, somewhat upstream from Island No. 4, indicated a gorge beginning at that point behind the ice that already blocked the way downstream.
(d) Water backed up behind the jammed ice until, on January 29, it entered the plaintiff’s plant to a depth of 4.5 feet on the generator floor. The plant was forced to close on January 29 and did not resume operation until February 17, 1952.
(e) A substantial thaw occurred between January 31 and February 2. By February 2, the ice had receded somewhat from the plaintiff’s dam, a channel had been cut through it by the water, and the tailrace levels had subsided so that the plant was no longer under water.
On that date, two patches of smooth ice were observed in the vicinity of Islands Nos. 5, 6, and 7 which resembled sheet ice in general appearance. These were not noticed by persons who had observed the river previously when the jam was at its height. On the basis of all the evidence, it appears that these upstream patches of what appeared to be sheet ice, on February 2, were byproducts of the thaw and subsequent freezing that had occurred after the jam had reached its height and were not the initial obstructions that caused the jam.
(f) At its peak, the jam that caused the 1952 flood consisted of a continuous, unbroken body of ice that bore against the barrier of sheet ice in the Starved Eock pool and built back upstream from that point to the face of the plaintiff’s dam. It is immaterial if, in the process of its formation, minor, temporary jams formed upstream, broke loose, and joined the accumulation downstream or that, at some points upstream in the continuous mass, the ice piled up vertically into gorges that were higher and deeper than the vertical dimensions of the ice farther downstream. The barrier that held in the river the mass of ice that finally backed the water into the plaintiff’s plant was the sheet ice in the Starved Eock *267 pool. The record contains no evidence that overrides the compelling inference that, if it had not been there, most of the broken sheet ice and slush that came downstream and jammed in behind it, in 1952, would have passed on out of the Fox, and that no gorge sufficient to cause the flooding that occurred would have formed.
19. (a) In 1953 plaintiff commenced a new action in this court (No. 268-53) in which it claimed that the 1943 and 1952 floods (and a less destructive jam that occurred in 1946) were all caused by the Starved Rock dam. The commissioner who heard the evidence in that case concluded, after a full trial, that the Starved Rock dam was the cause of the 1952 flooding of the plaintiff’s plant.
(b) The court, however, sustained the defendant’s plea of res judicata and, accordingly, found it unnecessary to consider the case on its merits or to make any findings of fact except “that ice formed in the Fox River below plaintiff’s dam, and plaintiff’s power plant was again flooded, on January 29, 1952, and operations were not resumed until February 17,1952.” [4]
Plaintiff’s motion for rehearing and its petition to the Supreme Court for certiorari were both denied.[5]

The Legislative Basis for This Action

20. (a) In the first session of the 86th Congress, a bill, H.R. 5093 (hereafter referred to as the bill), was introduced, which provided for an appropriation of $326,000 to be paid to the plaintiff in satisfaction of its claims against the United States.[6] The text of the bill is as follows :
A BILL
For the relief of North Counties Hydro-Electric Company
Be it enacted Toy the Senate and House of Representatives of the United States of America in Congress *268 assembled, That the Secretary of the Treasury is authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, to North Counties Hydro-Electric Company of Illinois, the sum of $326,-000, in full satisfaction of all claims of such company against the United States for damages to its powerplant and dam at Dayton, Illinois, sustained as the result of a dam built by the United States on the Illinois Kiver, at Starved Nock near Ottawa, Illinois: Provided, That no part of the amount appropriated in this Act in excess of 10 per centum thereof shall be paid or delivered to or received by any agent or attorney on account of services rendered in connection with this claim, and the same shall be unlawful, any contract to the contrary notwithstanding. Any person violating the provisions of this Act shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined in any sum not exceeding $1,000.
(b) The bill was not enacted. Instead, by H. Res. 189, 86th Cong., 1st Sess. (hereafter referred to as the resolution), it was referred to this court for consideration and report to the House of Representatives under 28 U.S.C. §§ 1492 and 2509. The text of the resolution provided:
Resolved, That the bill (H.R. 5093) entitled “A bill for the relief of North Counties Hydro-Electric Company”, now pending in the House, together with all the accompanying papers, is hereby referred to the Court of Claims; and the court shall proceed with the same in accordance with the provisions of sections 1492 and 2509 of title 28 of the United States Code and report to the House of Representatives, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand as a claim, legal or equitable against the United States, and the amount of damages, if any, legally or equitably due from the United States to the claimant, the statute of limitations, the plea of res judicata, laches, any lapse of time, or any prior court decision of this claim by any court of the United States to the contrary notwithstanding. The Court of Claims is directed to consider the records of any previous trial of this case.
(c) The petition in this case was filed July 24,1959, pursuant to the resolution.

*269
The 1960 Flood

21. On January 12, 1960 (the day before the beginning of the trial of this action), heavy rain and unusually high temperatures in the area of the Fox caused an ice jam which had been accumulating for some days below the Dayton dam to flush out without causing any physical damage to the plaintiff’s plant.
22. (a) On January 19 conditions developed that soon caused another ice jam in the Fox. This one proved to be similar in character to the jam that caused the-flooding in 1952, but was substantially greater in magnitude, duration, and destructive effect. It flooded the plaintiff’s plant to a depth of 10 feet and put it completely out of operation from January 21 to May 7,1960. The plant did not become substantially operative until June 14 and intermittent trouble with the equipment was encountered until September 1960.
(b) On January 19 slush ice began to form in the Fox. During that day it kept flowing out into the Illinois.
(c) On January 20 slush ice began to accumulate and freeze solid in the Starved Eock pool in the Fox above the Main Street bridge at Ottawa.
(d) On January 21 the slush ice above the Main Street bridge had frozen into a solid mass of knitted ice, covering the width of the river.[7] Additional slush ice, which continued to form upstream, was accumulating behind it. Meanwhile, the Illinois was completely open and some water was flowing out of the Fox underneath the ice.
(e) On January 22 the Fox was filled by a continuous jam of ice all the way from Ottawa to Dayton, except for occasional, small patches of open water, none of which extended the width of the river. At least as far upstream as the upper end of Island No. 3, the river was covered by chunks of slush ice, frozen together into a solid sheet of knitted ice.
*270 Above that point, there was evidence of gorging at several places where the ice, coming downstream, had piled up above the level of the sheet of knitted ice that blocked its way.
(f) On January 28 the Illinois remained open and flowing. The Starved Eock pool was still covered with knitted ice, composed of slush, frozen solid, and the jam upstream had greatly increased. It grew progressively worse in the days that followed and the water which backed up behind the barrier of ice not only flooded the plaintiff’s plant to a depth of 10 feet but also flooded much of the surrounding area.
(g) There was a pressure ridge across the Fox, somewhat above Island No. 3, in the vicinity of the normal upstream end of the Starved Eock pool, where the ice had piled up above the level of the knitted ice downstream. From that point up to the Dayton dam, the ice formed a rough, irregular jam, the height of which increased progressively as it approached the dam and kept increasing for several days. At the face of the dam, the ice was as high as the top of the dam on January 23 and, in the following days, was higher. The vertical structure of the ice indicated that gorging had occurred at various points above the head of the Starved Eock pool. At the Dayton bridge, the ice reached a level well above the floor of the bridge and the bridge was dislocated by the action of the ice.
A few, relatively narrow patches of open water in the midst of the jam had largely frozen over and closed in by January 24.
(h) Gauge readings, taken after the ice was jammed the length of the stretch between Dayton and Ottawa, showed that the water level at the plaintiff’s plant fluctuated as the water was blocked or found temporary ways through or around the jam. While the jam persisted, the water level at the plaintiff’s plant was generally higher and fluctuated more violently than the levels shown by gauges located at various points downstream, but still above the head of the Starved Eock pool.
These differentials indicate that gorges, within the ice jam, which were located above the head of the Starved Eock pool, impeded the flow of the stream and contributed *271 substantially to the flooding of the plaintiff’s plant if, indeed, they were not the principal, immediate causes of it.
Defendant’s contention (based on these differentials in water levels, and the structure of the ice above the head of the Starved Rock pool) that the gorging which caused the flooding occurred upstream from the head of the Starved Rock pool and, consequently, that it cannot be said that the Starved Rock pool was the cause of the flooding, ignores the fact that the whole mass of ice that was jammed in the river above the Starved Rock pool was blocked from egress downstream by the heavy cover of solid, knitted ice in the Starved Rock pool itself. Wherever the gorges were, the whole mass of which they were a part was held in the river by the slush ice that had congealed into a solid cover over the Starved Rock pool. It was behind this heavy, knitted slush ice blockage in the Starved Rock pool that the ice, coming downstream, accumulated until, there being no place, else for it to go, it packed in, above and below the normal surface of the stream, forming gorges which blocked the flow of the river and caused, among other damaging consequences, the flooding of the plaintiff’s plant.
(i) On the basis of the voluminous record of evidence (photographic, oral, and written), which discloses the condition and behavior of the Fox, daily, during the latter part of January 1960, the conclusion is unavoidable that the heavy cover of knitted slush ice in the Starved Rock pool effectively blocked the egress from the Fox of massive quantities of ice that came downstream during that period and was the initial, effective cause of the jam of ice in the Fox, of which any gorges, upstream, that may have immediately caused or accentuated the flooding conditions at the plaintiff’s plant were only a part.

The Causes of the Floods

23. (a) Ice in the Fox takes various forms. The variations derive from various combinations of physical factors. Whatever may have been the cause and character of the numerous other formations of ice that have occurred in the Fox, the jams in 1943, 1952, and 1960 that caused direct *272 physical damage to the plaintiff’s property, and upon which the plaintiff relies as the basis for its claim that its property has been taken, were generally similar in character and resulted from generally similar combinations of weather and other physical factors.
(b) They all formed in subfreezing weather when there was no excessive rainfall or melting of snow and ice in the area of the Fox. All were jams in which frazil or slush ice formed during the subfreezing weather, floated downstream, accumulated behind an obstruction in the Fox below the Dayton dam and built back progressively until the quantity of ice and other material jammed in the stream below the dam so impeded the river’s flow that the water, even though not augmented by excessive rainfall or melting snow, and not high enough to flood the plant if it had been able to flow freely downriver, backed up behind the jam to such a level that it entered the plaintiff’s plant and damaged the buildings and equipment.
(c) The first questions to be determined are (1) whether the Starved Eock pool, created in the Fox by the construction and operation of the Starved Eock dam, causes such jams or contributes substantially to their occurrence, (2) whether they might occur even if the Starved Eock pool did not exist, and (3) whether, if the Starved Eock pool does cause them, or helps to cause them, they are a direct, natural, or probable result of the construction and operation of the Starved Eock dam.
24. (a) The evidence leaves little room for doubt that the Starved Eock pool was a substantial factor in causing the 1952 and 1960 floodings. The heavy cover of ice in the still water of the pool was the barrier that held the ice in the river, in each of those years, and enabled ice floating downstream to accumulate and build back upstream continuously to the Dayton dam to such an extent, and in such a way, that it blocked the river’s flow and caused the dammed-up water to flood the plant. The evidence does not show positively that it had a similar, direct effect in causing the 1943 jam, but does not dispel the possibility that it did.
(b) Whether similar jams might occur in the Fox in the absence of the Starved Eock pool is conjectural. Considera *273 tions bearing on that question are discussed in findings 25-29.
25. Over a long period of years, before the Starved Rock dam was built, the Fox was not immune to the formation of ice in sufficient quantities and in such form as to damage structures as far up the river as the plaintiff’s property. The evidence does not show that any of the earlier ice formations was of the kind of which plaintiff now complains, nor does it indicate the points in the river where the blockage that initiated the earlier jams occurred. Such of them as are described in the historical evidence appear to have been composed primarily of broken ice, carried down the Fox during periods of relatively warm weather by high water, already at flood stage by reason of excessive rainfall and melting snow and ice. Apparently, much, if not all, of the flood damage that then occurred would have occurred regardless of the presence of ice in the river and such damage as was directly caused by the ice appears to have resulted from the impact of floating ice, carried by the flood waters, upon the structures that were damaged. But it is clear that ice jams of some sort occurred in the Fox before the Starved Rock pool was created.
26. The Fox, between plaintiff’s property and the Illinois, contains a number of physical obstructions, any of which might block ice and other materials floating in the river. The severity of any resulting jams, and whether they would be of such kind, or of such size, as would cause flooding of the plaintiff’s plant, would depend, in part, upon (a) the severity and duration of a combination of physical factors (primarily weather), additional to the conformation of the channel of the Fox, and (b) whether obstructions in the Fox, other than ice covering the Starved Rock pool, afford adequate anchors to hold in the river a sufficient quantity of ice to cause flooding at the plaintiff’s plant at times when the general level of the stream is not high enough to flood the plant otherwise.
27. The factors essential to the creation of an ice jam, other than the capacity of the potential anchors to hold the ice in the stream, include persistence of weather cold enough to form substantial quantities of ice, especially frazil ice, and *274 conditions that would cause large quantities of the ice, so formed, to float down the river within a short period of time. The necessary factors include also a quantity of water, flowing in the river as the jam develops, that is sufficient to flood the plant when blocked by the jammed ice but not so great as to flush the mass of ice loose from whatever obstruction is holding it, before flooding occurs.
28. There has been no substantial change in the weather pattern in the area of the Fox throughout the period covered by the record. It is a reasonable inference that cold spells of adequate duration to form substantial quantities of frazil ice and the other physical factors required to create jams of the size that have caused the flooding of the plaintiff’s plant are likely to occur from time to time. The interval between the times when all such factors concur is not shown to follow any predictable cycle, however, and the estimates in evidence, based primarily on the three floods that have occurred, that such conditions are likely to coincide on the average about once every 8 to 10 years or once every 5 to 10 years, appear to be little more than intelligent guesses based on experience, since 1933, that is too limited to establish a definite pattern.
29. Considered as a whole, the evidence does not dispel the possibility that ice gorges of a sort that could cause damage to the plaintiff’s plant might occur in the Fox even if the Starved Eock dam had never been built. The record contains no clear or persuasive evidence, however, that any such gorge ever did form in the Fox, except behind a blockage of ice in the Starved Eock pool,[8] and it remains conjectural whether, in the absence of the impediment to egress of floating ice added to the previous condition of the Fox by the still backwater of the Starved Eock pool, the obstructions or constrictions in the channel, or any of the bridges that were there before the Starved Eock dam was built, afford an adequate anchor to sustain a jam, against forces as powerful as those generated by the jam that occurred in 1960, long enough to *275 cause floods of tbe kind that occurred then, and in 1952 and 1943.
30. (a) The building of the Starved Eock dam added to the aggregation of physical factors pertinent to the formation of ice jams in the Fox a backwater pool of relatively still water, extending 2.5 miles upriver. The still water in that pool is more readily susceptible to freezing than that part of the river would be otherwise. Moreover, because it is a backwater, with its current slowed, ice which forms in it is not subjected to such positive flushing action as the faster current of the natural stream would have through the lower 2.5 miles of its course if the backwater were not there.
(b) In this way, creation of the Starved Eock pool increased the likelihood that sheet ice would form more readily and in greater quantities and would remain longer in the lower 2.5 miles of the Fox as a barrier to the egress of ice floating down the river than it would if the still backwater of the Starved Eock pool did not exist. To this extent, the construction of the Starved Eock dam increased the likelihood that ice jams would form in the Fox, upon the occurrence of a suitable combination of the physical conditions necessary to cause substantial quantities of frazil ice to form and to come down the river.
31. The ice jams that caused damage to the plaintiff’s plant are shown by the record to be creatures of a combination of physical factors which includes, in addition to the physical characteristics of the stream, a coincidence of particular weather conditions.
Despite the overall consistency of the general weather pattern in the area of the Fox, because of the inherent unpredictability of the peculiar combination of weather factors essential to the formation of ice jams of the sort that occurred in 1943,1952, and 1960, there is no adequate basis for a positive finding that such jams will recur inevitably within the remaining useful life of plaintiff’s property or that they will recur, on the average, at intervals of 8 or 10 years or at any other particular interval of time.
32. Although there is no evidence that the State of Illinois and its engineers who planned the Starved Sock dam specifically foresaw that the operation of the dam would cause *276 ice jams in the Fox, there is ample basis for a reasonable inference that those who planned the project knew, or should have known, that it would create a backwater pool in the Fox, that the presence of such a pool would enhance the likelihood that sheet ice would form in the lower reaches of the Fox and stay there longer than it would otherwise, and that floating ice, whenever it occurred, would be more likely to jam in the Fox behind the resultant, added impediment to its egress than it would if the Fox were left as it was.
Taking account of the vagrant character of the weather factors that must coincide in order to cause ice jams of a size and kind capable of backing up water into the plaintiff’s plant at times when the general level of the river is not high enough to flood the plant otherwise, and the fact that apparently no ice jams like these had ever occurred before, the evidence affords no adequate basis for a finding that the defendant, who finished and since 1933 has operated the Starved Rock dam, should have foreseen that ice jams in the Fox, having the peculiarly destructive character and consequences of those that flooded the plaintiff’s plant in 1952 and 1960, would be a direct, natural, or probable consequence of the construction and operation of the Starved Rock dam.

Whether There Has Been A Taking

33. The “taking” for which the plaintiff claims compensation is not a physical appropriation of its property but “an impairment of the properties’ ability to earn income, upon which its value is based.” [9] The methods the plaintiff proposes for computing its compensation appear to add to the amount, which represents such impairment, the following: the plaintiff’s out-of-pocket costs for repairing damages to its plant caused by the floods, and actual loss of income while the plant was out of operation after such floods.
34. The only ostensibly feasible means of attempting to measure, as of either 1952 or 1933, any reduction in the market value of plaintiff’s plant attributable to ice jams caused by the Starved Rock pool is by capitalizing anticipated income absent the flood threat and deducting from it a figure *277 determined in a way that would reflect whatever reduction of future income is fairly attributable to future floods.[10]
35. Following essentially such a method, the plaintiff has offered opinion evidence for the purpose of showing that the value of the plaintiff’s property was $527,600[11] as of January 1, 1952, and $318,700[12] as of March 1, 1952 (a date shortly after the alleged taking by the 1952 flood). The plaintiff claims the difference of $208,900 as reasonable compensation for the alleged taking if the court should conclude that a taking occurred as a result of the 1952 flood.
36. Alternatively, the plaintiff has offered opinion evidence for the purpose of showing a fair market value of $900,000 as of January 1, 1933, and a fair market value of $674,000 as of March 1, 1933. The difference of $226,000 is the amount claimed as compensation for the alleged taking if the court should conclude that a taking occurred when the Starved Rock pool reached project elevation in 1933.[13]
37. Each of the computations proposed by the plaintiff rests on the assumption, taken as of the date of valuation, that a succession of floods attributable to the construction of the Starved Rock dam would certainly occur at average intervals of once every 8 years, throughout the remaining useful life of the plaintiff’s property, and that, on the average, such floods would cause damage to the plaintiff’s plant and *278 impairment of its earnings equivalent to the average of the stipulated damages caused by the 1943,1952, and 1960 floods.
38. It is impossible to find any continuing impairment in the earning capacity of the plaintiff’s plant because (a) the injuries caused by the floods do not permanently reduce the earning capacity of the plant and because there is no way to foretell (b) whether there will be any further floods attributable to the Starved Nock dam, (c) when such floods may occur, or (d) what damage they may cause if they do occur.
39-. (a) The physical injury to the plant and the impairment of plaintiff’s earnings, caused by the ice jams that have occurred, are not continuous. They are specifically identifiable with one or another of the several floods. When the plant has been cleaned up and repaired after each flood, so that it can maintain operations without interruptions attributable to failure of equipment damaged by that flood, the direct damage from that flood, including any impairment of earnings it caused, has ceased to accrue.
(b) The only sense in which such injuries might be claimed to be continuous is through the threat of future injury by future floods. Yet future injuries, when or if they occur, will be specifically related only to the jam and the flood that cause them. They will not be attributable to previous floods and will not continue after the plant has again been repaired and restored to operation.
40. (a) The validity of the concept that the injuries plaintiff has suffered constitute a partial taking of its property is impaired, not only by the lack of continuity of the impairment of its earnings, but also by the. absence of a persuasive, evidentiary basis for finding that future, damaging floods, caused by ice jams attributable to the Starved Nock pool, were inevitable as of either 1952 or 1933, or that they would certainly recur at average intervals that could be fixed with any reasonably definite assurance.
(b) In 1952, when plaintiff claims a taking occurred by reason of the flood of that year, as well as in 1933, when the Starved Rock pool reached project elevation, the prospect of damage from future floods remained subject to many contingencies. It was impossible then to predict with any *279 assurance, as it is now, whether or how often ice jams of a kind that would cause flooding of the plaintiff’s plant would occur in the future or what damage they would cause to the plaintiff’s plant if they should occur.
(c) Thus the basis for the assumptions on which the plaintiff’s claim that its future earning capacity was impaired in 1952 or 1933 is an aggregation of highly speculative elements. Added to the inherent uncertainties involved in basing any determination of present market value exclusively on a capitalization of anticipated future income are uncertainties as to whether or when the combination of weather factors essential to the formation of frazil ice will occur in combination with the other conditions required to form ice jams of the kind that have caused damage to the plaintiff’s plant, uncertainties as to whether, if such jams do occur, they will grow large enough or last long enough to cause the plant to be, flooded, and uncertainties as to whether, if they do, the damage they cause will be comparable with that caused by the previous floods.
What the plaintiff proposes here is quite different, in degree if not in kind, from measurements of future damage anticipated as a result of a permanent reduction in productive capacity that will cause a continuing, reasonably certain curtailment of future income, or even as a result of seasonal floods or other cyclical phenomena, that can be anticipated at reasonably predictable, regular intervals. The floods in question here are almost wholly unpredictable.
(d) The evident possibility that any of the assumptions plaintiff relies upon may be wrong, and that any hypothetical determination of impaired 1952 or 1933 market value based upon them may vary greatly from the value plaintiff will actually realize through future earnings, invalidates the basic concept that the creation of so uncertain a threat of future damage constitutes a taking of a measurable part of the value of plaintiff’s property in either 1952 or 1933.
To establish a partial taking, it is essential that the part of the property taken be susceptible to more certain and precise identification, in terms of value, than is possible in this case.
*280 41. For the reasons stated in findings 33 through 40, the record affords no adequate basis for a finding that there was a taking of the plaintiff’s property by the defendant in either 1952 or 1933.

Equitable Damages

42. (a) Even though there is no adequate basis for finding that a taking has occurred that would sustain a judicial award of compensation, the fact remains that the United States has continued since 1933 to realize the benefits to navigation it sought through completion and operation of the Starved Nock dam, and the presence in the Fox of the backwater pool created by that dam appears clearly to have been a substantial, and probably an essential, factor in causing damage to plaintiff’s plant and impairment of its income in 1952 and 1960. Probably, the presence of the backwater pool was a factor, also, in causing the 1943 damage, and it is a potential cause of additional, but uncertain, similar injury at unpredictable intervals in the future.
(b) The parties have stipulated that plaintiff’s out-of-pocket costs for repairs necessitated by the three floods that have occurred and its loss of power revenues attributable directly to those floods are as follows:

Loss of Power Revenues

1943_ $20,151
1952_ 10,155
1960_ 49, 933

Cost of Repairs

1943_ 23,907
1952_ 16,160
1960_ 16,752
137, 058

*0

 Both the reference of this matter to the court and the filing of the petition (on July 24, 1959) occurred prior to the opinions of the Supreme Court in Glidden Co. v. Zdanok, 370 U.S. 530 (1962). The court deems proper the filing of this report without reference to the opinions in that case.

 Thereafter, plaintiff’s motion for rehearing was overruled. Plaintiff’s petition for writ of certiorari was denied by the Supreme Court. 355 U.S. 882 (1957).
The court had previously considered and denied defendant’s motion to dismiss the second suit, particularly with reference to the 1943 flood, on the grounds of statute of limitations and res judicata. North Counties Hydro-Electric Co. v. United States, 127 Ct. Cl. 467, 118 F. Supp. 375 (1954).

 In the 85th Congress, a bill (H.R. 10419), introduced for the relief of plaintiff, passed the House of Representatives on July 15, 1958, and the Senate on August 14, 1958, but the bill failed of approval by Pocket Veto of the President.

 Regarding the types of icing conditions, see findings 9 and 10, infra.

 Among them are: Rumley v. United States, 169 Ct. Cl. 100 (1965); Town of Kure Beach v. United States, 168 Ct. Cl. 597 (1964); Georgia Kaolin Co. v. United States, 145 Ct. Cl. 39 (1959).

 Regarding the related question of collateral estoppel, see Creek Nation v. United States, 168 Ct. Cl. 483 (1964).
In the instant case, this court has made findings of fact. If any of these findings are inconsistent with those of the previous actions between, plaintiff and defendant, we feel that such a departure from the principles of collateral estoppel is justified. As indicated above, our function in the present action includes the reporting to Congress of the facts relative to an “equitable claim.”

 Initially, the plaintiff (actually the predecessor of the plaintiffs in Burkhardt v. United States) sued in the Court of Claims. This court determined that the plaintiff’s property had been “taken” and granted judgment for the plaintiff. Willow River Power Co. v. United States, 101 Ct. Cl. 222 (1944). Then, the Supreme Court reversed the judgment for the plaintiff on the ground that there had been, no compensable “taking.” 324 U.S. 499 (1945). In accord with the mandate of the Supreme Court, this court dismissed the petition. 103 Ct. Cl. 785, 82 F. Supp. 333 (1945). The congressional reference action followed.

 In support of its contention, defendant cites the following cases: Hart v. United States, 58 Ct. Cl. 518 (1923); Choteau v. United States, 20 Ct. Cl. 250 (1885).

 The amount of $50,000 represents approximately 3 percent, noncompounded, on the actual losses of plaintiff from the dates of the three floods, and the court believes that amount to be adequate and fair compensation under the circumstances of this case.

 The plaintiff’s property is subject to the following encumbrances:
a. A deed ol trust dated Jan. 1, 1942, in favor of the Northern Trust Company, Trustee, for $325,000.
b. A deed of trust to John W. Day, as Successor Trustee, securing mortgage bonds dated Feb. 1, 1928; second mortgage; to secure a bond issue of $350,000.
The record does not show to what extent, if any, the debts secured by those deeds of trust have been curtailed.

 The record and decision in that cage are a part of the record in this one.

 108 Ct. Cl. 470.

 138 Ct. Cl. 380-384.

 355 U.S. 882.

 In the 85th Congress, a bill (H.R. 10419), introduced for the relief of plaintiff, passed the House of Representatives on July 15, 1958, and the Senate on August 14, 1958, but the bill failed of approval by Pocket Yeto of the President.

 This ice in the Starred Root pool increased in thickness as the cold weather continued and the jamming of ice in the river progressed. Defendant’s witness Carnegie reported that, on Feb. 27, 1960, some of the ice that then blocked the channel in the Starved Rock pool at Ottawa, near the Main Street bridge, was 4 to 5 feet thick and was bedded on the river bottom. This was indicated by mud when the chunks were turned over, as a launch, used as an ice breaker, tried to open a channel.

 There is no persuasive proof that the gorge that caused the 1943 flood was based upon a separate anchor, upstream from the Starved Rock pool, but merely a lack of positive proof that the 1943 jam was continuous between Dayton and the Starved Rock pool, which was covered with Ice and had ice jammed in behind it as far up the Fox as the witnesses could see from their downstream observation points.

 Plaintiff's Requested Findings of Fact (finding 23j).

 Because of the absence of a market for powerplants, valuation by comparable sales is impossible, and the plaintiff’s expert recognizes unsurmountable difficulties in attempting to identify any impairment of the value of plaintiff’s property for the purposes of this case on the basis of cost, either depreciated original cost or replacement cost.

 This valuation of $527,562 (without rounding) is based on capitalization of an anticipated average net income of $35,303, for 33 years, at 6 percent ($502,362), plus acquisition cost of the land ($172,370) discounted for 33 years, at 6 percent ($25,200).

 The reduced value of $318,670 (without rounding) after taking is reached by capitalizing anticipated average net income of $35,303 for 33 years (at 7 instead of 6 percent, to reflect added investment risk from floods), or $450,254 ; adding thereto $18,478, the reversionary value of the land (at 7 instead of 6 percent) ; and deducting therefrom $150,062 (the total of $40,067- — the cost of repairs necessitated by the 1943 and 1952 floods; $30,306 — income losses suffered while the plant was shut down by those two floods, and $79,689 — the present worth of the right to receive, at four 8-year intervals, $50,277, which is the average cost of the three floods in 1943, 1952, and 1960 of $45,706, plus 5 percent for inflation and 5 percent for revenue losses from near floods).

 The same theory and concept govern plaintiff’s determination of the 1933 figures as those for 1952, but different capitalization rates, economic life of the property, and production, income, and experience records were used.